**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DENNIS CROSBY, on behalf of
himself and all others similarly
situated; JACKIE STEVEN POSTELL;
DANNY RAY COCHRAN,

   *Plaintiffs-Appellants,*

    v.

CITY OF GASTONIA, a municipality
existing under the laws of the
State of North Carolina,

   *Defendant-Appellee.*

No. 10-1153

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:06-cv-00462-RJC-DSC)

Argued: December 9, 2010

Decided: March 10, 2011

Before Sandra Day O'CONNOR, Associate Justice
(Retired), Supreme Court of the United States, sitting by
designation, and KING and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opin-
ion, in which Justice O'Connor and Judge Davis joined. Judge
Davis wrote a separate concurring opinion.

---

**COUNSEL**

**ARGUED:** Fred William DeVore, III, DEVORE, ACTON & STAFFORD, Charlotte, North Carolina, for Appellants. Benjamin Robert Sullivan, Jr., PARKER, POE, ADAMS & BERNSTEIN, LLP, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Anthony Fox, Susan W. Matthews, PARKER, POE, ADAMS & BERNSTEIN, LLP, Charlotte, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Retired officers of the Gastonia, North Carolina Police Department appeal the district court's judgment in favor of the City of Gastonia with respect to several claims arising from the failure of the Gastonia Policemen's Supplemental Pension Fund (the "Fund"). The judgment incorporated by reference the court's final Order, which dismissed the officers' federal claim and granted summary judgment to the City on a pair of related state law claims. *See Crosby v. City of Gastonia*, 682 F. Supp. 2d 537 (W.D.N.C. 2010). We affirm.

I.

A.

The Fund came into being in 1955 by virtue of an Act of the North Carolina General Assembly. The Act entrusted management of the Fund to a Board of Trustees, comprised of three City officials, but the City proper was accorded no authority to direct or control the Fund's administration.

The Act was amended a number of times over the years, the most pertinent occasion being in 1959 when the General

Assembly added a funding proviso. According to the amended Act, a retired officer who had earned a vested interest in the Fund by meeting age and service requirements

> shall receive monthly for the remainder of his life from the [Fund], *so long as funds are available*, an amount equal to two percent for each five years of service, or major portion thereof, not to exceed fourteen per cent of his average monthly salary for the three highest salaried years while employed by [the Department].

1959 N.C. Sess. Laws ch. 301, § 2 (emphasis added). All subsequent amendments to the Act retained the funding proviso.

The City adopted a parallel Ordinance in 1983. The Ordinance more or less faithfully tracked the language of the Act, although it omitted the 1959 funding proviso, an apparent oversight that remained uncorrected for eight years. The year 1983 also marked the debut of an "Employee Information Guide" distributed generally to City employees. The 1991 version of the Guide explained merely that "[a]dditional pension funds are available as a supplement to the Retirement System for both Police and Fire personnel. Details concerning these are available in the respective departments." J.A. 243.[1]

In 1989, the City issued a pamphlet entitled "Career Opportunities in Law Enforcement with the City of Gastonia Police Department." The pamphlet, made available for a time to potential police officers, notes simply that "[t]he Gastonia Police Department also has a supplemental pension fund which pays 2% for every five years of service." J.A. 252. Finally, in 2001, the Police Department created a website that, for at least a while, contained a statement that "[t]he Police

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

Department also has a supplemental pension fund for police officers." J.A. 255.

## B.

In the early 1990s, the Fund began to experience financial difficulties, and, in 1995, the Board of Trustees ordered an audit. The audit revealed that the Fund would fail without additional income. Since its inception, the Fund had been supported through myriad sources, including surcharges on criminal fines, vending machine proceeds, direct allocations from the City, and refunds of State contributions to another retirement fund made on behalf of City officers who subsequently left employment prior to qualifying for benefits.

Responding to the audit's findings, the Board invoked a provision of the Act authorizing contributions from active officers working toward retirement. In 1996, the active officers approved by referendum a proposal to deduct 2% of their salaries for deposit with the Fund. Unfortunately, the officers' efforts failed to restore the Fund to solvency. A follow-up audit in 2001 concluded that salary contributions from active officers would have to be increased from 2% to "as much as" 7.5% to avoid utter depletion of the Fund within six years. J.A. 595.

In a second referendum, conducted in April 2002, the active officers voted 154 to 4 to "authorize the Board of Trustees to seek legislation to stop the 2% salary deduction," and "allow the Board of Trustees to ask for legislation amending [the Act] to allow for an eligible employee to receive their contributions from the [F]und prior to leaving employment." J.A. 516. Shortly thereafter, the Board asked the City to adopt a resolution requesting the General Assembly to amend the Act to implement the wishes of the active officers as expressed through the referendum. The City complied, with the result that the Assembly amended the Act in October 2002 to foreclose eligibility for supplemental benefits to all new

hires, cease further contributions to the Fund from active officers, and refund the entirety of those officers' prior contributions. *See* 2002 N.C. Sess. Laws. ch. 130, § 1. The Board carried out its statutory mandate to pay benefits to vested retirees until August 2005, when its assets were at last exhausted.

C.

In October 2006, three of the retirees brought suit in state court against the City, which elected to remove the matter to the Western District of North Carolina. The plaintiffs in that proceeding sought to certify a class comprised of all the vested retirees, but while their motion for certification was pending, another group of more than sixty retired officers filed a similar federal action. The district court ultimately declined to certify a class, but it permitted consolidation of the two cases, the upshot being that, on June 24, 2008, the court received an Amended Complaint filed on behalf of all the plaintiffs.

The Amended Complaint asserted four counts for relief: (1) that the City was liable pursuant to 42 U.S.C. § 1983 for, among other things, "[i]nterfering with [the plaintiffs'] contractual rights as guaranteed by the Contract Clause of the United States Constitution";[2] (2) that the City had also run afoul of various provisions of the North Carolina Constitution; (3) that the conduct of the City toward the plaintiffs gave rise to a contract as defined by North Carolina law, which the City had failed to perform; and (4) that the City had breached a state law fiduciary duty to the plaintiffs.

---

[2]The Clause provides, in pertinent part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Supreme Court and nearly all federal courts have, over the years, inconsistently denominated this key provision of Article I as both the "Contract Clause" and the "Contracts Clause." Because the text of the Constitution speaks of the obligation of "contracts" in the plural, we will use that form of the noun to refer to the Clause in this opinion.

The discovery process refined the plaintiffs' claims and theories, limiting the issues before the district court on cross-motions for summary judgment.[3] With respect to the initial count of the Amended Complaint, the court ruled that the City's conduct toward the plaintiffs was not an impairment of obligation within the meaning of the Contracts Clause. *See Crosby*, 682 F. Supp. 2d at 544. Absent such an impairment, the court reasoned, it lacked jurisdiction over the subject matter of the claim. *See id.* at 545.

The ruling on the jurisdictional issue left only state law claims, which a North Carolina court might thereafter have adjudicated. The district court chose instead to decide the state claims on the merits in recognition of the developed record and because the case had been pending for more than three years. *See Crosby*, 682 F. Supp. 2d at 545-46. Having elected to proceed, the court granted summary judgment to the City on the contract and fiduciary duty claims. In so doing, the court strongly intimated that the plaintiffs had failed to establish the existence of either an enforceable contract or a cognizable legal duty for which the City could be held liable, *see id.* at 546-47, but ultimately concluded that

---

[3]For example, although Count II of the Amended Complaint alleged state constitutional violations, the plaintiffs' summary judgment motion did not mention the North Carolina Constitution at all, instead confining its citations and argument to authorities construing the federal Constitution. The district court followed the plaintiffs' lead, requesting supplemental briefing regarding whether the parties' supposed contract had been "impaired," but restricted solely to the interpretation of that term in the context of its appearance within the Contracts Clause of the Constitution of the United States; tellingly, in their responsive submissions, both parties observed the court's parameters. Thus, the district court quite evidently considered the plaintiffs to have forgone their state constitutional claims, *see e.g.*, *Forrest Drive Assocs. v. Wal-Mart Stores, Inc.*, 72 F. Supp. 2d 576, 586 n.5 (M.D.N.C. 1999) (allegations neither argued nor briefed at summary judgment stage deemed abandoned), and therefore did not address those claims in its final Order.

even in the presence of an enforceable contract, no breach had occurred, *see id.* at 549.[4]

The district court entered its judgment adverse to the plaintiffs on January 7, 2010. By notice timely filed on February 3, 2010, the plaintiffs appeal.

## II.

### A.

The City removed the initial filing to the district court on the ground that it gave rise to a federal question within the contemplation of 28 U.S.C. § 1331, in that the plaintiffs had asserted a claim pursuant to the Civil Rights Act of 1871. The current iteration of that Act provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges,

---

[4]With particular respect to the fiduciary duty claim, the district court premised its summary judgment for the City upon alternative holdings that the plaintiffs had abandoned the issue by not proffering supporting evidence or argument, and that the City had in any case retained its governmental immunity. *See Crosby*, 682 F. Supp. 2d at 546. Neither the court's judgment nor its final Order mentioned a pair of counterclaims asserted by the City, namely, that two of the plaintiffs had served on the Board of Trustees and another had participated in recruiting and hiring officers, rendering all three potentially liable to indemnify the City for any money judgment. Because indemnification was contingent upon liability first being imposed upon the City and the judgment below foreclosed that result, the court implicitly resolved the counterclaims. The district court's judgment therefore constitutes a final decision disposing of all claims, over which we possess appellate jurisdiction pursuant to 28 U.S.C. § 1291. *See, e.g.*, *Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 543 (6th Cir. 1986); *Am. Family Mut. Ins. Co. v. Jones*, 739 F.2d 1259, 1261 n.1 (7th Cir. 1984).

or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.[5] A federal civil rights claim based upon § 1983 has two essential elements: "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In *Carter v. Greenhow*, 114 U.S. 317 (1885), a Richmond property owner tendered negotiable coupons detached from matured State bonds as part payment for real estate taxes owed to the sovereign. Notwithstanding that the 1879 act authorizing the bonds prescribed the coupons as receivable in payment of all State taxes, and that the same prescription was imprinted upon the coupons themselves, the tax collector refused to accept them as legal tender. The basis for the refusal was intervening legislation in 1882 that forbade State collectors from accepting anything in satisfaction of tax liabilities other than "gold, silver, United States treasury notes, and national bank currency[.]" 114 U.S. at 319. The dispute remained unresolved, with the result that the tax collector seized personal items from the property owner's place of business to satisfy the underlying tax debt. The property owner filed suit, maintaining that he was entitled to a remedy for the seizure under the provisions of the 1871 Civil Rights Act because he had been deprived of one or more constitutional rights under color of state law.

---

[5]Federal subject matter jurisdiction over a § 1983 civil rights claim also lies specifically in accordance with 28 U.S.C. § 1343(a), which confers jurisdiction upon the district courts "of any civil action authorized by law to be commenced by any person . . . (3) [t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights."

The Supreme Court characterized those rights as the freedom to pay the taxes in the desired fashion and immunity from enforcement of the tax debt as a delinquency, each "derive[d] from the contract with the state, contained in the act of March 28, 1879, and the bonds and coupons issued under its authority." 114 U.S. at 322. The Court identified the Contracts Clause as the lone potential constitutional source securing the asserted rights, *see id.*, but held them to be unenforceable through a civil rights action. Justice Matthews, writing for the Court, explained:

> That constitutional provision, so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally. . . . In any judicial proceeding necessary to vindicate his rights under a contract affected by . . . legislation, the individual has a right to have a judicial determination declaring the nullity of the attempt to impair its obligation. That is the only right secured to him by that clause of the constitution.

*Id.* Justice Matthews observed that the plaintiff had not shown any deprivation of his right to seek declaratory or injunctive relief through the judicial process, having "simply chosen not to resort to it." *Id.*

The Supreme Court surmised that "[i]t might be difficult to enumerate the several descriptions of rights secured to individuals by the constitution, the deprivation of which, by any person, would subject the latter to an action for redress under [the civil rights laws]." 114 U.S. at 323. The Court concluded, however, that it was "sufficient to say that the declaration now before us does not show a cause of action within its terms." *Id.*

As a result of the Supreme Court's holding in *Carter*, then, recourse to § 1983 for the deprivation of rights secured by the Contracts Clause is limited to the discrete instances where a

state has denied a citizen the opportunity to seek adjudication through the courts as to whether a constitutional impairment of a contract has occurred, or has foreclosed the imposition of an adequate remedy for an established impairment. Section 1983 provides no basis to complain of an alleged impairment in the first instance.

We acknowledge that one of our sister circuits has reached the opposite conclusion. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam) ("The City's argument that section 1983 provides no relief for a party deprived of its rights under the Contracts Clause is without merit."). The short opinion issued in *Santa Ana* briefly addressed *Carter*, maintaining that the precedent set forth in the latter was "not to the contrary" of the Ninth Circuit's holding. The court of appeals rested its assertion on a lone quote from *Dennis v. Higgins*, 498 U.S. 439 (1991), in which Justice White responded via footnote to the dissent's citation of *Carter* by noting that the Court

> has already given that decision a narrow reading, stating that the case "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the 'right secured to him by that clause of the Constitution'[the contract clause], to which he had 'chosen not to resort.'"

*Dennis*, 498 U.S. at 451 n.9 (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 n.29 (1979) (internal citation omitted) (alteration in original)). The Supreme Court in *Dennis* recognized a § 1983 cause of action for the deprivation of rights secured by the Commerce Clause; as such, the continuing vitality of *Carter* and its precedent with respect to the Contracts Clause was not before the *Dennis* Court.

Our view, in opposition to that of the Ninth Circuit, is that Justice White's reference to the "narrow reading" accorded

*Carter* was intended to address the usefulness of that case in providing a framework for the analysis of § 1983 claims invoking parts of the Constitution other than the Contracts Clause, or alleging the deprivation of rights secured by other federal laws. We agree with Justice White that, inasmuch as the *Carter* Court disposed of the matter before it largely on procedural grounds and therefore lacked the opportunity to substantively explore the contours of a properly pleaded claim, Justice Matthews's decision is of limited utility in determining whether § 1983 might afford a remedy for infringements of federal rights not previously considered in that context. There is little doubt, however, that *Carter* stands even today for the proposition that an attempted § 1983 action alleging state impairment of a private contract will not lie.[6]

---

[6]The dispute underlying *Kestler v. Board of Trustees*, 48 F.3d 800 (4th Cir. 1995), was similar to the one at bar, and it arrived before us as an appeal of declaratory and injunctive relief granted under the auspices of § 1983 following statutory changes to retirement benefits that, according to the district court, begat an unconstitutional impairment of the plaintiffs' contractual rights. We reversed on the ground that a 1987 decision of the North Carolina Court of Appeals, since overruled, mandated the conclusion that any rights conferred by prior legislative enactments had failed to vest in the plaintiffs, who had not reached retirement age. *See* 48 F.3d at 804. Judge Hall dissented, stating his belief that subsequent state court decisions had undermined the authority on which the panel majority relied. *See id.* at 805 (Hall, J., dissenting).

We were not called upon in *Kestler* to decide at the threshold whether § 1983 might provide a remedy for impairments in violation of the Contracts Clause, and neither the panel majority nor Judge Hall raised the issue sua sponte, as we have now chosen to do. We point out, however, that the trail we have blazed today is entirely consistent with our prior, non-precedential decision in *Andrews v. Anne Arundel County*, 114 F.3d 1175, 1997 WL 321573 (4th Cir. June 13, 1997) (per curiam) (unpublished) (affirming district court's denial of attorney fees otherwise afforded prevailing parties by 42 U.S.C. § 1988(b) because, on the authority of *Carter*, "there is no cause of action available under [§ 1983] for violations of the Contract Clause").

### B.

We need not scrutinize the Amended Complaint in especial detail to discern that the plaintiffs are attempting to pursue a prohibited claim. Count I of the Amended Complaint — subtitled "(Violation of Federal Constitutional Rights) (42 USC 1983)" — alleges, inter alia, that a contract existed between the plaintiffs and the City, and that certain acts by the latter "violate[d] the constitutional rights of each plaintiff . . . by [i]nterfering with his contractual rights as guaranteed by the Contract Clause of the United States Constitution." Amended Complaint 5. As a component of the remedies prayed for, the plaintiffs requested the district court to "find the termination of the vested pension plan . . . to be unconstitutional . . . and that the [City] be enjoined from not paying future retirement benefits to the vested police officers." *Id.* at 8.

The most reasonable interpretation of the Amended Complaint is that it seeks a judicial determination under § 1983 that the City unconstitutionally deprived the plaintiffs of their right to receive supplemental pension payments. There is no allegation that the City had impermissibly thwarted the plaintiffs in any prior attempt on their behalf to vindicate the application of the Contracts Clause to the parties' dispute by resort to the courts.

The question presented in this case is therefore indistinguishable in any meaningful way from that in *Carter*, which controls the result we announce today. We conclude that Count I of the Amended Complaint, insofar as it does not allege that the plaintiffs have been deprived of a protected federal right, fails to state a claim upon which relief may be granted pursuant to 42 U.S.C. § 1983. *See* Fed. R. Civ. P. 12(b)(6); *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 957-58 (6th Cir. 1986) (recognizing that trial court properly dismissed § 1983 action in accordance with Rule 12(b)(6), as facts alleged in complaint did not establish essential element of state action).

## C.

The district court, however, did not dismiss Count I on Rule 12(b)(6) grounds, but instead relied on Rule 12(b)(1) to dismiss Count I for lack of subject matter jurisdiction. The court concluded that the plaintiffs had failed to plead facts constituting an "impairment" of obligation of contract, and thus could establish no violation of the Contracts Clause. *See supra* Part I.C. In so ruling, the court appears to have construed Count I to allege a direct constitutional challenge to the actions taken by the City, rather than to complain more indirectly that the City's supposed contravention of the Constitution deprived the plaintiffs of one or more rights protected by § 1983.

The district court had the discretion, and indeed the duty, to construe the pleadings "so as to do justice." Fed. R. Civ. P. 8(e). Having construed the Amended Complaint as formulating a direct challenge, the district court correctly analyzed the alleged acts of the City as establishing nothing more than a mere breach of contract, not rising to the level of a constitutional impairment of obligation. *See St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 149 (1901) (assuming, arguendo, that contract arose from city's 1856 charter to plaintiff to provide gas for streetlights, subsequent 1897 ordinance that forbade city from paying interest on cost of lamps rendered obsolete by electric lights "was but a denial by the city of its obligation to pay").[7]

---

[7]As the Seventh Circuit has explained, "when a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contact; it is committing a breach of contract." *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996). We wholeheartedly agree with our learned colleagues that "[i]t would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution." *Id.* If the offended party retains the right to recover damages for the breach, the Contracts Clause is not implicated; if, on the other hand, the repudiation goes so far as to extinguish the state's duty to pay damages, it may be said

Moreover, we cannot criticize the court's decision to proceed under Rule 12(b)(1) in dismissing the "direct" portion of Count I, although courts have also entered a dismissal in such cases pursuant to Rule 12(b)(6). Numerous reported cases take either course. *Compare, e.g.*, *St. Paul Gaslight Co.*, 181 U.S. at 151 (dismissing appeal for want of subject matter jurisdiction), *and Pitsch Recycling & Disposal, Inc. v. County of Ionia*, 386 F. Supp. 2d 938, 943 (W.D. Mich. 2005) (plaintiff seeking declaratory judgment "fail[ed] to state a claim under the Contract Clause that implicates the federal question jurisdiction of the Court"), *with, e.g.*, *United Auto., Aerospace, Agric. Implement Workers of Am. Int'l*, No. 10-1069, 2011 WL 241965, at *3 (1st Cir. Jan. 27, 2011) (concluding that "plaintiffs did not plead sufficient facts . . . to survive a Rule (12)(b)(6) motion" as to Contracts Clause claim), *and Moore v. Church Hill House/Agent*, 220 F.R.D. 454, 456 (E.D. Va. 2003) (dismissing, pursuant to Rule 12(b)(6), plaintiff's Contracts Clause claim for failing to allege state action).[8]

In parsing Count I to discover a direct constitutional challenge, however, the district court was not free to disregard the more straightforward § 1983 claim. Absent a conclusion that the pertinent allegations of the Amended Complaint were so "plainly insubstantial" or "entirely frivolous" as to be mani-

to have impaired the obligation of contract. *See id.* at 1250-51 ("The analogy to the principle that government does not violate the takings clause if it stands ready to pay compensation for its taking should be evident." (citations omitted)). The plaintiffs did not contend below that they were somehow barred from recovering damages from the City as the result of the latter's purported breach. In fact, Count III of the Amended Complaint alleges, and the district court ruled upon, a claim under North Carolina law for breach of contract. *See infra* Part III.

[8]In either case, we review de novo the district court's decision to dismiss. *See Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009) (appeal of dismissal in accordance with Rule 12(b)(1) for lack of subject matter jurisdiction); *Unus v. Kane*, 565 F.3d 103, 115 (4th Cir. 2009) (appeal of dismissal pursuant to Rule 12(b)(6) for failure of plaintiffs to state claim).

festly outside federal jurisdiction, *see Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999), that portion of Count I could be properly dismissed only for failure to state a claim, as provided by Rule 12(b)(6). *See also Bell v. Hood*, 327 U.S. 678, 681-83 (1946) (where complaint is drawn to seek recovery under Constitution or other federal law, dismissal for want of subject matter jurisdiction is to be avoided unless claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous").[9]

Similar to the situation in *Bell v. Hood*, the plaintiffs' Amended Complaint served to "raise serious questions, both of law and fact, which the district court can decide only after it has assumed jurisdiction over the controversy." 327 U.S. at 683-84. As evidenced by the foregoing discussion, Count I was susceptible to nuances of interpretation requiring a careful examination of its allegations "to decide whether [they] state a cause on which the court can grant relief as well as to determine issues of fact arising in the controversy." *Id.* at 682. The allegations in Count I could not be said to have been insubstantial or frivolous, and inasmuch as the matter originated in state court, the claims under federal law plainly were not asserted solely for the purpose of invoking the jurisdiction of the district court.

Whether for lack of subject matter jurisdiction (under Rule 12(b)(1)) or for failure to state a claim upon which relief may be granted (under Rule 12(b)(6)), the end result is the same: the district court should have dismissed, and did dismiss, Count I. The court's judgment as to that count must therefore be affirmed. *See Catawba Indian Tribe v. City of Rock Hill*,

---

[9]Justice Black, writing for the Court in *Bell v. Hood*, elaborated that jurisdiction "is not defeated . . . by the possibility that the averments might fail to state a cause of action. . . . For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." 327 U.S. at 682.

501 F.3d 368, 374 (4th Cir. 2007) (where district court had granted summary judgment to defendant on direct Contracts Clause challenge on ground that assumed impairment served legitimate public purpose, affirmance was proper even though court of appeals concluded instead that no impairment had occurred).[10]

### III.

### A.

We move on at last to address the district court's grant of summary judgment to the City on the plaintiffs' state law claims for breach of contract and for breach of fiduciary duty. At the outset, we observe that the lower court exercised supplemental jurisdiction over these non-federal claims under the authority of 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts shall have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See also Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (recognizing that supplemental jurisdiction statute, in particular § 1367(c), likewise confers discretion upon district courts in certain instances to remand pendent claims for disposition outside federal system).

Had the federal claims in this matter truly been susceptible to dismissal solely for lack of subject matter jurisdiction, as the district court supposed, its discretionary exercise of supplemental jurisdiction over the state-law claims would have been problematic. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500,

---

[10]In *Catawba Indian Tribe*, we reiterated our oft-repeated admonition that "we review judgments, not opinions. . . . We are accordingly entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below." 501 F.3d at 372 n.4.

514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."). The effects of a Rule 12(b)(1) dismissal, which can occur at any stage of the litigation, *see id.* at 506, can seem draconian. *Arbaugh* was itself a rather extreme illustration, in that the district court granted the defendant's motion to dismiss and vacated its judgment notwithstanding that a jury had already awarded damages to the plaintiff on her combined federal and state claims. The Supreme Court reversed the district court's dismissal on the ground that subject matter jurisdiction had actually existed, *id.* at 515-16, but the warning klaxon sounded by the Court in *Arbaugh* cannot fail to reverberate throughout the federal bench and bar.

*Arbaugh* left undisturbed, however, the long-standing principle that, "[i]n contrast, when a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction . . . over pendent state-law claims." 546 U.S. at 514. In this case, Count I could not have been legitimately dismissed in its entirety without invoking Rule 12(b)(6), so although the district court purported to act pursuant to Rule 12(b)(1) exclusively, we are confident that the court's misapprehension had no bearing upon its decision to assume supplemental jurisdiction. In other words, the court below would certainly have proceeded in the same manner had it announced the proper grounds for dismissal, and in doing so would not have abused the discretion afforded it under the law.[11] Hence, we find no error in the district court's decision to address the state-law

---

[11]A district court "enjoy[s] wide latitude in determining whether or not to retain [supplemental] jurisdiction over state claims." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). Several factors, including convenience and fairness to the parties plus concerns for judicial economy, weighed heavily in favor of retaining supplemental jurisdiction over the state law claims in this case. By the time judgment had been entered below, the proceedings had been pending for more than three years, and the parties had already fully briefed summary judgment motions.

claims, and we proceed to review the court's grant of summary judgment to the City.[12]

## B.

Rather than embark on a lengthy analysis of North Carolina law to decide whether the various actions of the City over the years engendered an enforceable contract with the plaintiffs, we will assume, as the district court did, that such a contract existed. Even so, the gorilla in the room is that a fundamental term of the contract since 1959, before any of the plaintiffs can be said to have acquired vested rights in the Fund, was the statutory caveat that benefits would be paid only "so long as funds are available." 1959 N.C. Sess. Laws ch. 301, § 2. The plaintiffs maintain that the funding proviso ceases to apply upon vesting of an officer's entitlement to benefits, but that contention is unavailing and finds no support in the clear language of the statute.

"One of the 'chief purposes' of contract law is 'to secure the realization of expectations reasonably induced by the expressions of agreement.'" *Joyner v. Adams*, 387 S.E.2d 235, 239 (N.C. Ct. App. 1990) (quoting 3 A. Corbin, *Contracts* § 537 (1971)). It is not reasonable, in our opinion, to expect that a contractual obligation expressly contingent upon available funding may nonetheless be enforced once funding has dissipated and the contingency has been frustrated. The far less tortured interpretation leads one to expect that once the funding evaporates, so does the obligation. And without a contractual obligation, there can be no cognizable breach thereof and, thus, no legal claim for damages. *See One Beacon Ins. Co. v. United Mech. Corp.*, 700 S.E.2d 121, 124 (N.C. Ct. App. 2010) ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of

---

[12]A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

the terms of that contract." (citations and internal quotation marks omitted)). In the absence of an actionable breach, the district court correctly concluded that the City was entitled to summary judgment on the state law contract claim.[13]

### IV.

Pursuant to the foregoing, the district court's judgment in favor of the City is affirmed.

*AFFIRMED*

DAVIS, Circuit Judge, concurring:

I concur fully in Judge King's fine opinion for the panel. I simply note that no one doubts that the Appellants, dedicated former public servants who spent a career in law enforcement regularly putting their lives on the line, are deserving of every consideration. As the panel opinion notes, it appears that the Supreme Court of North Carolina, in ways that vary significantly from the approach of federal courts, has been especially solicitous of Contracts Clause claims asserted in a wide range of circumstances by government employees against their state and local employers. *See, e.g.*, *Faulkenbury v. Teachers' and State Employees' Retirement System of North Carolina*, 483 S.E.2d 422 (N.C. 1997). Nevertheless, like the district court, this court simply cannot blink at the fact that when the North Carolina legislature amended the Supplemental Retirement Fund in 1959, it expressly conditioned such benefits on the availability of funds, and it did so in a

---

[13]From the outset, the plaintiffs have lived on the edge regarding the preservation of their fiduciary duty claim. *See Crosby*, 682 F. Supp. 2d at 546 (addressing claim on merits although plaintiffs "failed to brief or present evidence on the issue"); *supra* note 4. Having also neglected to brief the issue on appeal, the plaintiffs, we adjudge, have finally skated off the precipice. *See Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997) (issues set forth in notice of appeal but not subsequently briefed are deemed waived).

manner that did not impose any statutory duty on the City of Gastonia. Though the City touted the existence of the fund and no doubt used it as a part of its overall recruitment strategy to hire law enforcement officers, it is clear that, throughout the fund's existence, the burden of its continuing viability was placed squarely on the shoulders of its Trustees.

Notably, two of the Appellants actually served long terms as Trustees of the fund and were actively involved in earnest attempts to forestall the fund's collapse. The record shows that up until the bitter end, neither the Trustees nor any one else ever suggested that the City of Gastonia was legally obligated to come to the fund's rescue. This belatedly-filed litigation against the City of Gastonia is entirely understandable, given the circumstances. Nevertheless, the Appellants' claims fail as a matter of law.

The failure of the Trustees to stave off the demise of the fund was not for want of sincere efforts; it was a political failure that does not in any manner lessen the moral imperative that clearly underlies the Appellants' claims. Yet, that said, for the reasons stated in the panel opinion, we have no warrant to upset the district court's sound legal determinations.