IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-807

Filed: 18 June 2019

Wake County, No. 17 CVS 2597

NORTH CAROLINA INDIAN CULTURAL CENTER, INC., Plaintiff

v.

MACHELLE SANDERS, SECRETARY, N.C. DEPARTMENT OF ADMINISTRATION, in her official capacity, FURNIE LAMBERT, CHAIRMAN, N.C. STATE COMMISSION OF INDIAN AFFAIRS, in his official capacity, N.C. DEPARTMENT OF ADMINISTRATION, N.C. COMMISSION OF INDIAN AFFAIRS, STATE OF NORTH CAROLINA, AND PAUL BROOKS, Defendants

Appeal by Plaintiff from Order entered 23 April 2018 by Judge D. Thomas Lambeth, Jr. in Wake County Superior Court. Heard in the Court of Appeals 14 February 2019.

*Linck Harris Law Group, PLLC, by David H. Harris, Jr., for plaintiff-appellant.*

*Attorney General Joshua H. Stein, by Special Deputy Attorney General G. Mark Teague, for the State.*

*Lewis Brisbois Bisgaard & Smith LLP, by Christopher Derrenbacher, for defendant-appellee Paul Brooks.*

HAMPSON, Judge.

**Factual and Procedural Background**

North Carolina Indian Cultural Center, Inc. (Plaintiff) appeals from an Order

(1) granting summary judgment in favor of the State of North Carolina (State), the

North Carolina Department of Administration (DOA), the North Carolina Commission of Indian Affairs (Commission), Machelle Sanders (Sanders), Secretary of the DOA, in her official capacity, and Furnie Lambert (Lambert), Chairman of the Commission, in his official capacity (collectively, the State Defendants); (2) denying Plaintiff's Motion for Partial Summary Judgment; and (3) dismissing Plaintiff's Complaint against Paul Brooks (Brooks). The Record before us tends to show the following:

Beginning in or around 1983, the State began acquiring land in Maxton Township in Robeson County (Property) for the purpose of ultimately developing the North Carolina Indian Cultural Center (Cultural Center) with a focus on the heritage and culture of North Carolina's Native Americans. Plaintiff incorporated as a non-profit corporation in 1985 to "develop, establish, manage, furnish, equip, maintain, preserve, exhibit and interpret to the public the North Carolina Indian Cultural Center . . . ." Plaintiff has its own Board of Directors appointed under its Articles of Incorporation.

In 1989, the General Assembly enacted legislation directing the State to enter into a 99-year lease of the Property with Plaintiff for the sum of $1.00 per year for the establishment of the Cultural Center. The legislation also called for the lease to include certain terms and conditions, such as requiring Plaintiff to obtain funding of $4.16 million for the Cultural Center within five years of a lease agreement. 1989 N.C. Sess. Law 1074, § 18. In 1992 and 1993, the General Assembly amended this

legislation by excluding from the prospective lease a portion of the Property used for a golf course, extending the timeframe for the State and Plaintiff to enter into a lease, and easing Plaintiff's funding requirements. *See* 1991 N.C. Sess. Law 900, § 22; 1993 N.C. Sess. Law 88, § 1; 1993 N.C. Sess. Law 561, § 33.

On 12 May 1994, Plaintiff and the State entered into a lease agreement for the Property, excluding the golf course (Lease). The Lease, among other provisions, included requirements that Plaintiff: maintain and improve the premises at no cost to the State; furnish utilities, including water service, to the Cultural Center; maintain certain insurance policies; provide ingress and egress via the main road through the Property, including to permit access to the golf course; and not sublease or assign the Lease without prior written approval from the DOA. The Lease was amended, pursuant to legislation, in 1997 to add an additional parcel of land to the Property and Lease and to reduce Plaintiff's funding obligation to $3 million. 1997 N.C. Sess. Law 41, § 1. The Lease was further amended, pursuant to additional legislation, in 2001 to eliminate the funding obligation altogether. 2001 N.C. Sess. Law 89, § 1.

The 1997 legislation also required Plaintiff to reorganize with a Board of Directors appointed by the Commission. 1997 N.C. Sess. Law 41, § 2. This legislation was amended in 2003, changing the makeup of Plaintiff's Board of Directors but leaving the Commission with the authority to appoint directors. 2003 N.C. Sess. Law 260, § 1 (hereinafter, 2003 Legislation). In 2009, an Administrative Law Judge issued

a decision blocking the Commission from appointing directors, which was subsequently adopted as a Final Agency Decision by the Commission. Subsequently, in 2011, a Superior Court Judge declared the 2003 Legislation unconstitutional.

In March 2010, a team from the State Construction Office, an office within the DOA, inspected the Property and on 26 March 2010 issued a Facility Condition Assessment Report (FCAR) on the Property. The FCAR identified a number of deteriorated or dilapidated buildings on the Property (including on the golf course) that needed significant repair or demolition. The FCAR observed there was vandalism throughout the site, theft of electrical wiring, and exposed wiring posing safety problems. With respect to the Cultural Center, the FCAR recommended a theater complex used for an outdoor drama be rebuilt, as it was in such an advanced state of deterioration it was unsafe for public access. In addition, the FCAR indicated the Cultural Center museum required substantial repairs, including complete renovation of the interior along with complete replacement of the electrical system. Among other things, the FCAR noted the museum had various Building Code violations and safety hazards, including exposed electrical wiring and its restrooms were unsuitable for public use. The FCAR further recommended demolition of a warehouse attached to the museum because it was in such poor condition. In his affidavit, John F. Webb, III, the Manager of the Leasing and Space Planning Section of the DOA, calculated the amount needed to make the immediate repairs necessary for the portion of the Property leased to Plaintiff was $2.083 million.

On 18 January 2011, the State issued Plaintiff a letter (Default Letter) detailing a number of claimed defaults under the lease, including failure to maintain and improve the leased premises as set out in the FCAR; failure to pay for water service to the Cultural Center; failure to obtain required insurance coverage; subleasing without prior written approval; and hindering access to patrons of the golf course. In addition, the Default Letter expressly invoked a requirement under the terms of the Lease that Plaintiff begin efforts to cure the defaults within 60 days and remedy the defaults within 120 days.

Plaintiff's then attorney formally responded by email on or about 17 March 2011, disputing any default under the Lease. Plaintiff, through its counsel, indicated Plaintiff had begun to address each of the concerns raised by the State, including obtaining new insurance policies. Plaintiff also asserted the Commission and DOA had interfered with Plaintiff's efforts to maintain the Property and interfered in contractual arrangements, including having "conspired and collaborated" with a private corporation to operate the golf course on the Property. Plaintiff further claimed the Commission and DOA "sabotaged the work" of the Cultural Center and resultantly were themselves responsible for the conditions on the Property. On 28 April 2011, in reply, the State sent Plaintiff correspondence disputing Plaintiff's assertions and noting the State was provided no evidence of efforts to cure the defaults.

On 3 October 2011, the Office of State Fire Marshall issued a report (Fire Marshall Report) to the DOA, identifying a number of Building and Fire Code violations existing on the Property, including at the theater, museum store, and warehouse. This Report also noted the theater stage, built in 2007, had not received necessary approvals prior to construction and appeared to be in violation of the Building Code as well.

In June 2012, the Joint Legislative Program Division Oversight Committee of the General Assembly directed its Program Evaluation Division to evaluate the current and long-term disposition of the Property. The Program Evaluation Division delivered its report on 12 December 2012 (PED Report). The PED Report noted many of the same problems as the 2010 FCAR and 2011 Fire Marshall Report, including dilapidated buildings, exposed wiring, vandalism, and theft of copper wiring. The PED Report identified over $2.1 million in necessary repairs to the Property, including demolition of the museum, warehouse, and amphitheater complex.

This PED Report further acknowledged that while the State had declared Plaintiff in default under the Lease, the DOA felt constrained from proceeding further by the legislative directive contained in the 1989 Session Law, as later amended, requiring the State to specifically enter into the Lease with Plaintiff. Among other recommendations, the PED Report recommended the General Assembly enact legislation terminating the Lease.

On 26 June 2013, Session Law 2013-186 was enacted, directing the DOA to terminate the Lease to Plaintiff within 15 days. *See* 2013 N.C. Sess. Law 186, § 2. On 10 July 2013, the DOA issued notice to Plaintiff that the Lease would terminate in 60 days. In 2014, a substantial portion of the Property previously leased to Plaintiff was sold to the Lumbee Tribe of North Carolina. The remainder was reallocated to the North Carolina Department of Environment and Natural Resources for incorporation into the Lumber River State Park.

On 3 October 2013, Plaintiff filed an amended complaint[1] against the DOA, the Commission, the State, as well as Brooks, a former Chairman of the Commission and then Chair of the Tribal Council of the Lumbee Tribe, Inc. (2013 Complaint). In the 2013 Complaint, Plaintiff alleged breach of contract and various constitutional violations, seeking both damages and a declaratory judgment that Session Law 2013-186 was unconstitutional.

The Record reflects no proof the 2013 Complaint was served on Brooks. On 10 February 2014, Brooks filed Motions to Dismiss and an Answer to the 2013 Complaint, alleging, *inter alia*, failure by Plaintiff to provide proof of service of the 2013 Complaint on Brooks. On 11 March 2016, prior to Brooks's Motions being heard, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice.

---

[1] The original complaint from this action is absent from the record.

On 6 March 2017, Plaintiff filed the present action against the State Defendants and Brooks (collectively, Defendants). In this Complaint, Plaintiff alleged Defendants' actions "were taken with the clear intent to breach the Ground Lease" and that the Lease was a valid contract, constituting waiver of sovereign immunity. Plaintiff further alleged breach of contract against the State Defendants and sought a declaratory judgment that Session Law 2013-186 was invalid. Against Brooks specifically, Plaintiff alleged tortious interference with contract and a claim for damages pursuant to 42 U.S.C. § 1983. Plaintiff sought various damages and the return of the leased portion of the Property from the State.

On 24 May 2017, the State Defendants filed a Motion to Dismiss under Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure. On 12 June 2017, Brooks filed a Motion to Dismiss under Rules 12(b)(1), (2), (4), (5), and (6) of the North Carolina Rules of Civil Procedure. In his Motion, Brooks alleged, *inter alia*, that Plaintiff failed to provide proof of service of process of the 2013 Complaint prior to taking a voluntary dismissal and that Plaintiff's Complaint was thereby barred by the statute of limitations.

On 19 February 2018, the State Defendants filed a Motion for Summary Judgment. On 16 March 2018, Plaintiff filed a Motion for Partial Summary Judgment "on the issues of liability[.]" On 23 April 2018, the trial court entered its Order granting summary judgment to the State Defendants, denying Plaintiff's Partial Summary Judgment Motion, and granting Brooks's Motion to Dismiss.

## Issues

The dispositive issues in this case are whether: (I) the trial court erred in granting summary judgment for the State Defendants and denying partial summary judgment for Plaintiff on the breach-of-contract and constitutional claims; and (II) Plaintiff's voluntary dismissal of the 2013 Complaint tolled the statute of limitations on the claims against Brooks where there is no proof he was served with the 2013 Complaint.

## Analysis

### I. Summary Judgment Motions

*A. Standard of Review*

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting *Forbis v. Neal*, 361 N.C. 519, 523-24, 649 S.E.2d 382, 385 (2007)).

*B. Breach of Contract*

Plaintiff first argues the trial court erred in granting summary judgment to the State Defendants and, in turn, denying Plaintiff partial summary judgment on its breach-of-contract claim. Plaintiff contends the State Defendants breached the Lease by (1) attempting to appoint directors under the 2003 Legislation; (2) failing to

prevent vandalism on the Property; and (3) enacting Session Law 2013-186 requiring termination of the Lease.

Notably, although Plaintiff disputes the nature, extent, and cause of Plaintiff's defaults under the Lease, Plaintiff makes no contention it was not, in fact, in default. Indeed, the pleadings and affidavits submitted by the State demonstrate a number of areas in which Plaintiff was in default, including failing to procure necessary insurance policies and failing to maintain the leased portion of the Property. Despite being put on notice of these defaults, particularly as to the dilapidated nature of the Property, Plaintiff failed to take steps to cure its default between 2010, when the FCAR issued, and the end of 2012 when the PED Report issued, with both Reports detailing many of the same problems.

Rather, Plaintiff contends it was the State Defendants who were in breach of the Lease by breaching the implied covenant of "quiet enjoyment." "[T]he provisions of a lease are interpreted according to general principles of contract law." *Wal-Mart Stores, Inc. v. Ingles Mkts., Inc.*, 158 N.C. App. 414, 418, 581 S.E.2d 111, 115 (2003) (citation omitted). " 'Under North Carolina law, . . . a lease carries an implied warranty that the tenant will have quiet and peaceable possession of the leased premises during the term of the lease[,] . . . stand[ing] for the principle that a landlord breaches the implied covenant of quiet enjoyment when he constructively evicts the tenant.' " *Charlotte Eastland Mall, LLC v. Sole Survivor, Inc.*, 166 N.C. App. 659, 663, 608 S.E.2d 70, 73 (2004) (alterations in original) (quoting *K & S Enters. v.*

*Kennedy Office Supply Co.*, 135 N.C. App. 260, 267, 520 S.E.2d 122, 126-27 (1999), *aff'd per curiam*, 351 N.C. 470, 527 S.E.2d 644 (2000)). "An act of a landlord which deprives his tenant of that beneficial enjoyment of the premises to which he is entitled under his lease, causing the tenant to abandon them, amounts to a constructive eviction. Put another way, when a landlord breaches a duty under the lease which renders the premises untenable, such conduct constitutes constructive eviction." *Marina Food Assoc., Inc. v. Marina Restaurant, Inc.*, 100 N.C. App. 82, 92, 394 S.E.2d 824, 830 (1990) (citations omitted). "A tenant seeking to show constructive eviction has the burden of showing that he abandoned the premises within a reasonable time after the landlord's wrongful act." *K & S Enters.*, 135 N.C. App. at 266-67, 520 S.E.2d at 126 (citation omitted).

Specifically, Plaintiff argues the Commission's efforts to appoint directors to Plaintiff's Board pursuant to the 2003 Legislation constituted a constructive eviction. However, the Commission's own Final Agency Decision blocking enforcement of the 2003 Legislation was issued in May 2010. Plaintiff made no allegation in its Complaint and offered no evidence at summary judgment that it was forced to abandon the Property during this time. Indeed, the Record demonstrates Plaintiff did not abandon the Property until after enactment of Session Law 2013-186 when the Lease was, in fact, terminated. Moreover, Plaintiff makes no showing that the State Defendants' actions resulted in Plaintiff falling into default under the Lease.

To the contrary, Plaintiff submitted two affidavits in support of its case. One from Bobbie Jacobs-Ghaffar (Jacobs-Ghaffar), a former employee of Plaintiff 1990–1994. Jacobs-Ghaffar spoke to the work done by Plaintiff and its value and history in the community during her employment in the early 1990s. The second more salient affidavit was from Beverly Collins-Hall (Collins-Hall), an active member of Plaintiff and spouse of the current Board Chair. Collins-Hall served as a Site Administrator at the Cultural Center 2001–2003 and again 2009–2013. In her affidavit, Collins-Hall emphasized the importance of Plaintiff and its facility in the community; her belief that "the Commission on Indian Affairs was an enemy" to Plaintiff; and various acts of vandalism to the Cultural Center. Collins-Hall further stated 2009–2013 she supervised 24 full-time employees at the Cultural Center and highlighted upgrades and maintenance to the Property during that period, as well as providing numerous photographs of the Property. Collins-Hall's affidavit in particular shows Plaintiff did not abandon the Property.

Plaintiff also claims the State Defendants breached the implied warranty of quiet enjoyment by allowing vandalism to occur at the Cultural Center. "However, it is long-settled that '[t]he covenant of quiet enjoyment . . . does not extend to the acts of trespassers and wrongdoers[.]'" *Charlotte Eastland Mall, LLC*, 166 N.C. App. at 663, 608 S.E.2d at 73 (alterations in original) (quoting *Huggins v. Waters*, 167 N.C. 197, 198, 83 S.E. 334, 334 (1914)). As in *Charlotte Eastland Mall*, Plaintiff does "not cite any cases in support of the proposition that the implied covenant of quiet

enjoyment imposes upon [defendant]-landlord the duty to a commercial tenant to prevent criminal acts by third parties, and we find none." *Id.*

Lastly, Plaintiff asserts the enactment of Session Law 2013-186, directing termination of the Lease, itself constitutes a breach. Plaintiff points to no authority for its position. Indeed, the evidence reflects the enactment of Session Law 2013-186 was consistent with the State's rights under the Lease. The State provided timely notice of default and gave Plaintiff an extended opportunity to cure its defaults. The evidence is undisputed the DOA sought this legislation for no other reason than to ensure its own compliance with legislative directives, since the General Assembly had directed the DOA to lease the premises specifically to Plaintiff. Consequently, Session Law 2013-186 did not constitute a breach of the Lease but rather constituted the State's enforcement of its right to terminate under the terms of the Lease.

Accordingly, we conclude where it is undisputed Plaintiff was in default under the Lease, the State Defendants terminated the Lease pursuant to its terms after giving notice of default and an opportunity to cure, and Plaintiff has made no showing of its abandonment of the premises constituting constructive eviction, the trial court did not err in granting summary judgment in favor of the State Defendants on Plaintiff's breach-of-contract claim. Consequently, the trial court also did not err in denying Plaintiff's Motion for Partial Summary Judgment on this ground.

*C. Constitutional Claims*

Plaintiff next asserts the trial court erred in granting summary judgment to the State Defendants on Plaintiff's claim that the enactment of Session Law 2013-186 violated a host of provisions of both the North Carolina and United States Constitutions, including the Contract Clause, prohibition on Bills of Attainder, the Takings Clause, due process protections of the Fourteenth Amendment, and general separation-of-powers principles. At the heart of Plaintiff's constitutional arguments is its position that Session Law 2013-186, by legislative action, bars Plaintiff from asserting rights under the Lease and seeking legal remedies through judicial action.

As such, Plaintiff first contends Session Law 2013-186's termination of the Lease constitutes an unconstitutional impairment of contract under the federal Constitution. "It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17, 52 L. Ed. 2d 92, 106 (1977) (citations omitted). "Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects. Thus, as a preliminary matter, appellant's claim requires a determination that the repeal has the effect of impairing a contractual obligation." *Id*. (footnote omitted).

As our North Carolina Supreme Court has noted: "Not every modification of a contractual promise, however, impairs the obligation of contract." *Smith v. State*, 298 N.C. 115, 128, 257 S.E.2d 399, 407 (1979) (citing *El Paso v. Simmons*, 379 U.S. 497,

506-07, 13 L. Ed. 2d 446, 453-54 (1965)). Here, though, we are faced with the State's termination of the Lease to which it was a party. Although the parties provide no direct authority addressing such an instance, we find guidance from the Fourth Circuit, in turn, guided by the Seventh Circuit:

> As the Seventh Circuit has explained, "when a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contact; it is committing a breach of contract." *Horwitz–Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir.1996). We wholeheartedly agree with our learned colleagues that "[i]t would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution." *Id*. If the offended party retains the right to recover damages for the breach, the Contracts Clause is not implicated; if, on the other hand, the repudiation goes so far as to extinguish the state's duty to pay damages, it may be said to have impaired the obligation of contract.

*Crosby v. City of Gastonia*, 635 F.3d 634, 642 n.7 (4th Cir. 2011) (citation omitted). This is consistent with our Supreme Court's holding in *Smith*, concluding there was no impairment of a contract where a legislative amendment made "no change in either the obligations of the parties or the remedies available to plaintiff in enforcing [its] agreement." *Smith*, 298 N.C. at 129, 257 S.E.2d at 407.

Here, of course, Plaintiff has asserted a breach-of-contract claim, and the State Defendants have not contended—and, indeed, on the Record before us could not contend—Session Law 2013-186 barred any right or remedy Plaintiff held under the Lease upon the State's repudiation of the Lease. Nor do the State Defendants argue this legislation acted as a statutory bar or defense to Plaintiff's breach-of-contract

claim for damages or other similar remedy. *See Horwitz–Matthews, Inc.*, 78 F.3d at 1250-51 (citations omitted). Thus, we conclude the evidence of record demonstrates enactment of Session Law 2013-186 made "no change in either the obligations of the parties or the remedies available to plaintiff in enforcing [its] agreement." *Smith*, 298 N.C. at 129, 257 S.E.2d at 407. Rather, the Record in this case shows Session Law 2013-186 was enacted to effectuate the terms of the Lease, including its termination provisions, and to provide for the subsequent disposition of the Property, not to impair Plaintiff's rights under the Lease. Therefore, Session Law 2013-186 did not act as an unconstitutional impairment of contract.

For the same essential reasons, Session Law 2013-186 does not constitute a Bill of Attainder because it was not punitive or retributive against Plaintiff. *See Citicorp v. Currie, Comr. Of Banks*, 75 N.C. App. 312, 316, 330 S.E.2d 635, 638 (1985) ("A [Bill of Attainder] is a legislative act that inflicts punishment on a person without a [judicial] trial."). It merely directed the DOA to proceed with termination of the Lease. Session Law 2013-186 did not deprive Plaintiff of any rights it had in the enforcement of the Lease or limit its remedies for the State's termination of the Lease. It did not bar Plaintiff from leasing any other property or otherwise continuing to operate. Rather, the legislation sought to advance "what the General Assembly determined was a legitimate state interest" in the use and disposition of State-owned property following Plaintiff's default under the existing Lease. *See id.* at 316-17, 330 S.E.2d at 638.

Nor does the State Defendants' assertion of rights under the Lease give rise to a takings claim. *See Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) ("The interferences with plaintiffs' lease rights were grounded on matters that, at times material herein, bespoke an effort to operate within the framework of the lease and applicable regulations, not to take plaintiffs' property rights. If defendant's interferences were unjustified or unreasonable, plaintiffs' rights emanate from the lease agreement, not the Fifth Amendment.").

Similarly, Plaintiff's claims of violations of due-process and separation-of-powers principles likewise fail. Plaintiff asserts Session Law 2013-186 precludes judicial determination of whether the Lease should be terminated. However, nothing in Session Law 2013-186 limited Plaintiff's right to seek a judicial determination either through the context of forcing a summary-ejectment action or through an action, like the present one, for breach of contract. Consequently, the trial court did not err in granting summary judgment for Defendants and in denying partial summary judgment for Plaintiff on these constitutional claims.

## II. Brooks's Motion to Dismiss

*A. Standard of Review*

"A statute of limitations or repose defense may be raised by way of a motion to dismiss if it appears on the face of the complaint that such a statute bars the claim." *Hargett v. Holland*, 337 N.C. 651, 653, 447 S.E.2d 784, 786 (1994) (citations omitted). Under Rule 12(b)(6), this Court conducts "a *de novo* review of the pleadings to

determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct." *Leary v. N.C. Forest Prods., Inc.*, 157 N.C. App. 396, 400, 580 S.E.2d 1, 4, *aff'd per curiam*, 357 N.C. 567, 597 S.E.2d 673-74 (2003).

In addition to the statute of limitations, Brooks also asserted defenses of lack of personal jurisdiction, insufficiency of process, and insufficiency of service of process. We review a trial court's decision to grant a motion to dismiss for lack of personal jurisdiction to see "whether the record contains evidence that would support the court's determination that the exercise of jurisdiction over defendants would be inappropriate." *M Series Rebuild, LLC v. Town of Mount Pleasant*, 222 N.C. App. 59, 63, 730 S.E.2d 254, 257 (2012) (citations and quotation marks omitted). "We review *de novo* questions of law implicated by the denial of a motion to dismiss for insufficiency of service of process." *New Hanover Cty. Child Support Enf't ex rel. Beatty v. Greenfield*, 219 N.C. App. 531, 533, 723 S.E.2d 790, 792 (2012) (citation omitted).

*B. Statute of Limitations*

Here, Plaintiff alleged claims against Brooks for tortious interference with contract and under 42 U.S.C. § 1983, based on his alleged role in the enactment of Session Law 2013-186 on 26 June 2013. Brooks moved to dismiss the claims against him under Rule 12(b)(6) on the basis, *inter alia*, that the Complaint showed on its face that the statute of limitations on Plaintiff's claims against him had expired.

The statute of limitations for both of Plaintiff's claims against Brooks is three years. "A plaintiff seeking to recover damages or to obtain other relief for . . . tortious interference with contract . . . must assert that claim within three years of the date upon which the underlying injury occurred." *Glynne v. Wilson Med. Ctr.*, 236 N.C. App. 42, 48, 762 S.E.2d 645, 649 (2014) (citing N.C. Gen. Stat. § 1-52(5)). "The three year statute of limitations as set forth in N.C.G.S. § 1-52 applies to 42 U.S.C. § 1983 actions brought in the North Carolina court system." *Faulkenbury v. Teachers' & State Employees' Retirement System*, 108 N.C. App. 357, 367, 424 S.E.2d 420, 424 (citations omitted), *aff'd per curiam*, 335 N.C. 158-60, 436 S.E.2d 821-22 (1993).

Here, Plaintiff contends, and the face of the Complaint demonstrates, the enactment of Session Law 2013-186 constituted the underlying injury allegedly caused by Brooks's actions. Plaintiff's Complaint in the instant action was not filed until 6 March 2017, over three years after the alleged injury occurred. Thus, on the face of the Complaint, Brooks's Rule 12(b)(6) Motion alleging the expiration of the statute of limitations was properly brought.

"Once a defendant raises a statute of limitations defense, the burden of showing that the action was instituted within the prescribed period is on the plaintiff." *Horton v. Carolina Medicorp, Inc.*, 344 N.C. 133, 136, 472 S.E.2d 778, 780 (1996) (citation omitted). "A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id*. (citation omitted). Here, Plaintiff contends the voluntary dismissal of the 2013 Complaint without prejudice tolled the

statute of limitations and allowed the filing of the new Complaint within one year. We disagree.

At the outset, we note resolution of this issue requires us to review matters outside of the pleadings. *See N.C. Railroad Co. v. Ferguson Builders Supply*, 103 N.C. App. 768, 771, 407 S.E.2d 296, 298 (1991) (earlier complaints and voluntary dismissals not referenced in pleading at issue constituted materials outside the pleadings for purposes of Rule 12(b)(6)). As such, we follow the lead of our prior case law addressing the same issue and review the parties' contentions on the impact of Plaintiff's voluntary dismissal of the 2013 Complaint on the statute of limitations through the lens of Rules 12(b)(2) (lack of personal jurisdiction), 12(b)(4) (insufficiency of process), and 12(b)(5) (insufficiency of service of process). *See Lawrence v. Sullivan*, 192 N.C. App. 608, 666 S.E.2d 175 (2008); *Camara v. Gbarbera*, 191 N.C. App. 394, 662 S.E.2d 920 (2008).

In *Camara*, we recognized:

> If an action is commenced within the statute of limitations, and a plaintiff voluntarily dismisses the action without prejudice, a new action on the same claim may be commenced within one year. N.C. Gen. Stat. § 1A-1, Rule 41(a) (2007). However, a plaintiff must obtain proper service prior to dismissal in order to toll the statute of limitations for a year. In *Latham*, this Court held that if a voluntary dismissal is based on defective service, the voluntary dismissal does not toll the statute of limitations.

191 N.C. App. at 396-97, 662 S.E.2d at 922 (internal citations omitted) (citing *Latham v. Cherry*, 111 N.C. App. 871, 873, 433 S.E.2d 478, 480 (1993)). In *Camara*, proper

service of the original action was never made. *Id.* at 396, 662 S.E.2d at 921. This Court noted:

> Plaintiffs' argument that the subsequent action is valid because it was brought within one year as prescribed by Rule 41(a) does not take into account that proper service on defendant was never obtained prior to the voluntary dismissal. Because the service was defective, the statute of limitations did not toll.

*Id.* at 397, 662 S.E.2d at 922. Thus, where the subsequent action was filed outside the three-year statute of limitations, this Court upheld the trial court's dismissal of the subsequent action. *Id.*

In *Lawrence*, the plaintiff filed her initial complaint within the statute of limitations. 192 N.C. App. at 622, 666 S.E.2d at 183. The original summons was returned undelivered; however, an alias and pluries summons sent to the same address was signed for by someone other than the defendant. *Id.* The plaintiff filed an affidavit of service and took a voluntary dismissal without prejudice the same day. *Id.* The plaintiff then filed a new complaint within one year. The defendant filed a motion to dismiss along with an affidavit stating she was not residing at the address where the first complaint had been served and that she had not received the summons and complaint in the first action. *Id.* The plaintiff failed to present any evidence to the contrary. This Court noted, "As defendant was never properly served with the first complaint, plaintiff's voluntary dismissal without prejudice did not toll the statute of limitations." *Id.* at 623, 666 S.E.2d at 183 (citation omitted). As the second

complaint was filed outside the statute of limitations, we, again, upheld the trial court's dismissal. *Id.*

In the present case, Brooks filed an affidavit stating he had no recollection of being served with a copy of the 2013 Complaint and summons. The only summons in the 2013 action directed to him is an unreturned alias and pluries summons. There is no proof of service of the 2013 Complaint or summons in the Record, and although Plaintiff contends service was made in 2013, Plaintiff provided no evidence of service on Brooks. Therefore, on this Record, Brooks was never served with the 2013 Complaint, and Plaintiff's voluntary dismissal did not toll the statute of limitations. As the Complaint in this action was filed outside the three-year statute of limitations for the claims against Brooks, the trial court properly granted Brooks's Motion to Dismiss.

## Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's 23 April 2018 Order granting summary judgment to the State Defendants, denying Plaintiff's Partial Summary Judgment Motion, and dismissing Plaintiff's Complaint against Brooks.

AFFIRMED.

Judges ZACHARY and BERGER concur.