RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

CHARLES N. KAMINSKI; LINCOLN PARK POLICE AND
FIRE RETIREES ASSOCIATION, INC.; MICHAEL J.
MOULIOS; LINCOLN PARK MUNICIPAL EMPLOYEES
RETIREES ASSOCIATION, INC.,

                   *Plaintiffs-Appellees*,

    *v.*

BRAD L. COULTER, et al.,

                   *Defendants*,

R. KEVIN CLINTON; NICK KHOURI,

               *Defendants-Appellants*.

No. 16-1768

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12810—Gershwin A. Drain, District Judge.

Argued: March 8, 2017

Decided and Filed: July 25, 2017

Before: BOGGS, SILER, and MOORE, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Joshua O. Booth, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Mark A Porter, MARK A. PORTER & ASSOCIATES P.L.L.C., Madison Heights, Michigan, for Appellees. **ON BRIEF:** Joshua O. Booth, Christina M. Grossi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Mark A Porter, Jamil Akhtar, MARK A. PORTER & ASSOCIATES P.L.L.C., Madison Heights, Michigan, for Appellees.

     BOGGS, J., delivered the opinion of the court in which SILER, J., joined. MOORE, J. (pp. 14–17), delivered a separate dissenting opinion.

---

**OPINION**

---

BOGGS, Circuit Judge.   This is a complicated case about the scope of governmental immunity.   The plaintiffs-appellees are retirees of the City of Lincoln Park.   In 2014, the city's dire financial condition led Michigan officials to place the city under the purview of an Emergency Manager pursuant to the authority granted by P.A. 436.[1]   The Emergency Manager, with the approval of Michigan's then-Treasurer Kevin Clinton, issued ten orders that temporarily replaced Lincoln Park retiree health-care benefits with monthly stipends that retirees could use to purchase individual health-care coverage.   Dissatisfied, some of the retirees brought suit in federal court under 42 U.S.C. § 1983, asserting that, *inter alia*, the orders violated their constitutional rights secured by the Contracts Clause, the Due Process Clause, and the Takings Clause.   In their complaint, the plaintiffs-appellees named a host of city and state officials and government entities as defendants, including Michigan Treasurer Kevin Clinton, who was sued in both his individual and official capacities.   As the litigation progressed, Nick Khouri became Treasurer of the State of Michigan and was subsequently substituted in Clinton's place in his official capacity.[2]   Both Clinton and Khouri filed motions to dismiss, arguing that qualified immunity and Eleventh Amendment immunity rendered them immune from suit.   The district court disagreed, holding that neither immunity theory applied to their actions and that the suit could proceed.   For the following reasons, we reverse.

I

A

In August 2013, the City of Lincoln Park faced financial distress.   Due to a combination of poor planning and an economic recession, the city found itself unable to meet many of its outstanding financial obligations.   In response to this crisis, the Lincoln Park City Council voted

---

[1]Local Financial Stability and Choice Act, Mich. Comp. Laws § 141.1541 *et seq.*

[2]Clinton remained a party to the dispute in his individual capacity.

to request that the State of Michigan perform a review of the city's financial condition pursuant to § 4(1)(a) of P.A. 436.  The State commissioned Gabriel Roeder to perform the evaluation, and he found, among other deficiencies, that the city's retirement systems were insufficiently funded and that immediate steps needed to be taken in order to ensure that the city's assets were not depleted.

In February 2014, Michigan Governor Rick Snyder appointed a financial-review team to examine the city's financial condition in greater detail.  After reviewing the Roeder evaluation and meeting with various Lincoln Park officials and representatives, the financial-review team concluded that a local-government emergency existed in Lincoln Park and that the appointment of an Emergency Manager was necessary for the city to avoid municipal bankruptcy.

Pursuant to the review team's recommendation, Governor Snyder appointed Brad Coulter as Emergency Manager for the City of Lincoln Park on July 3, 2014.  In his first report to the Michigan Treasurer, Coulter noted substantial problems with the funding for the city's retirement system.  Of particular concern were both the city's general pension fund, which was financed at 22% of its current and future obligations, and the city's pension fund for police and fire department retirees, which was financed at 31% of its current and future obligations.  Despite the fact that the city spent 40% of its budget contributing to these pension plans, both plans were projected to be fully depleted within ten to fifteen years.  In order to cure this funding deficiency, Coulter proposed temporarily modifying the city's collective-bargaining agreements.  Under his proposal, retiree health-care benefits would be replaced with a monthly stipend that could be used to purchase individual health-care coverage.  Coulter estimated that his proposal would save the city $3.2 million per year, which could then be used to re-fund the pension system.  Coulter submitted his proposal to the city's retirees, but they rejected his plan.

Coulter then submitted his proposal to Michigan State Treasurer ("Treasurer") Clinton. Under Michigan law, an Emergency Manager can modify an existing collective-bargaining agreement with the approval of the Treasurer if good-faith negotiations between the city and the represented parties fail and if the Treasurer finds that certain statutorily enumerated conditions are met.  *See* Mich. Comp. Laws § 141.1552(1)(k).  Specifically, the Treasurer must find that (1) a financial emergency in the local government "has created a circumstance in which it is

reasonable and necessary for the state to intercede to serve a legitimate and public purpose"; (2) the modification of the agreement is reasonable and necessary to deal with a generalized economic problem; (3) the modification is "directly related to and designed to address the financial emergency for the benefit of the public as a whole"; and (4) the modification is temporary and does not target specific classes of employees. *Id.* § 141.1552(1)(k)(i)–(iv). In a letter dated April 10, 2015, Treasurer Clinton found that these statutory conditions had been met and that Coulter could proceed with his proposal.

On April 22, 2015, Coulter issued ten orders consistent with the proposal that he sent to Treasurer Clinton. The orders terminated "the sections of all Collective Bargaining Agreements . . . regarding retiree health care and Medicare Part B reimbursement" for Lincoln Park retirees and replaced the eliminated benefits with a monthly stipend that ranged from $150 to $425 per month. In addition, because the orders eliminated Medicare Part B reimbursement, retirees over 65 years of age were required to begin paying individually into a Medicare Part B program.

B

Soon after these orders became effective, many of the affected retirees filed suit in federal court under 42 U.S.C. § 1983. The complaint named several defendants, including Emergency Manager Coulter, Treasurer Clinton, and various other retirement boards and entities. Of relevance to this appeal, Treasurer Clinton was sued in both his official and individual capacities for his role in the modification of the plaintiffs' health-care benefits. The complaint alleged numerous violations of the plaintiffs' constitutional rights, including violations of the Contracts Clause, the First Amendment, the Takings Clause, and the Due Process Clause. For relief, the complaint requested class certification for all of the affected plaintiffs, a declaratory judgment that Coulter's orders were unconstitutional, an injunction requiring the defendants to reinstate the health-care benefits outlined in the collective-bargaining agreements, attorney's fees, and to be otherwise "made whole."

After the complaint was filed, Treasurer Clinton was succeeded in office by Treasurer Nick Khouri. Pursuant to the Federal Rules of Civil Procedure, Khouri was automatically substituted in Clinton's place insofar as the complaint named Treasurer Clinton in his official

capacity. *See* Fed. R. Civ. P. 25(d). Although this extinguished the claims against Clinton in his official capacity, he still remained a party to the suit in his individual capacity.

Both Clinton and Khouri filed motions to dismiss the claims against them, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. They each argued that the plaintiffs' claims were substantively meritless, but they also raised various immunity defenses. Clinton argued that he was entitled to qualified immunity because, even if the modification of Lincoln Park's collective bargaining agreements amounted to a violation of the plaintiffs' constitutional rights, those rights were not "clearly established" at the time that the violation occurred. Khouri argued that, because the suit named him in his official capacity, he was entitled to Eleventh Amendment immunity.

The district court ruled on the defendants' motion to dismiss on May 5, 2016. It granted the motion with respect to the plaintiffs' First Amendment and Substantive Due Process claims, reasoning that they were meritless. With respect to the plaintiffs' remaining claims, however, the district court concluded that the plaintiffs had stated a viable claim for relief and that the defendants were not entitled to immunity. With respect to Clinton's qualified-immunity defense, the district court held that the plaintiffs' constitutional rights "were clearly established" and that thus qualified immunity was unavailable. With respect to Khouri's Eleventh Amendment-immunity defense, the district court concluded that, because the plaintiffs sought only prospective injunctive relief, Eleventh Amendment immunity was also unavailable as to the plaintiffs' remaining claims.

Citing the "collateral order" doctrine, both Clinton and Khouri appeal the district court's denial of their immunity defenses. Litigation against the remaining defendants, including Emergency Manager Coulter, currently continues in the district court below.

II

We have jurisdiction over only "final decisions of the district courts." 28 U.S.C. § 1291. Although the denial of a Rule 12(b)(6) motion to dismiss is not a final order, there are a few exceptions that permit courts of appeals to review non-final orders on an interlocutory basis. One exception is the collateral-order doctrine, which permits parties to appeal a non-final order

"if it (1) conclusively determines the disputed question; (2) resolves an important issue separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment." *Mohawk Indus., Inc v. Carpenter*, 558 U.S. 100, 105 (2009) (citation omitted). The Supreme Court has frequently applied the collateral-order doctrine in the context of immunity defenses, reasoning that a core attribute of the immunity defense is immunity from suit altogether. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) (Eleventh Amendment immunity); *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (qualified immunity). We therefore have jurisdiction to hear this interlocutory appeal.

The defendants-appellants' immunity questions are presented in the context of a Rule 12(b)(6) motion to dismiss. We review a district court's ruling on a Rule 12(b)(6) motion *de novo*. *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 767 F.3d 554, 558 (6th Cir. 2014). When analyzing a Rule 12(b)(6) motion, "[t]he complaint is viewed in the light most favorable to [the plaintiffs]; the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [the plaintiffs'] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When questions of immunity are presented in this context, the court's task can be difficult. The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). However, "[w]hen qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238–39 (citation omitted). Thus, we have held that it is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity," preferring instead that courts resolve the issue at summary judgment. *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). Nonetheless, certain immunity questions can still be resolved at the pleading stage with a sufficiently developed record. We have previously held that "a court may consider exhibits attached to the complaint, public records, [and] items appearing in the record of the case, . . . so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to

one for summary judgment." *Gavitt*, 835 F.3d at 640 (citing *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015)).

III

The complaint first alleges that the modification of the city's collective-bargaining agreements constitutes a violation of the Contracts Clause, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I § 10. The Supreme Court has adopted a three-part test to interpret this "facially absolute" command. *Energy Reserves Grp., Inc. v. Kan. Power and Light Co.*, 459 U.S. 400, 410 (1983). First, we must ask "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 411 (citation omitted). If it does, then we must ask if "the State . . . [has] a significant and legitimate public purpose behind the regulation." *Ibid.* (citation omitted). If one can be identified, the final inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purposes justifying" the state action. *Id.* at 412 (alteration in original) (citation omitted).

A

Before we reach the merits of the Contracts Clause claim, however, we must first determine whether 42 U.S.C. § 1983 supports a cause of action based upon an alleged Contracts Clause violation. Section 1983 permits a private cause of action to be brought against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any *rights, privileges, or immunities secured by the Constitution and laws.*" 42 U.S.C. § 1983 (emphasis added). Although not briefed by either of the parties, there is considerable debate over whether the Contracts Clause amounts to a "right, privilege, or immunity" secured by the Constitution that is enforceable by § 1983.

A brief history on § 1983 illuminates this issue. The precursor to 42 U.S.C. § 1983 was originally passed as § 1 of the Civil Rights Act of 1871. Ch. 22, 17 Stat. 13 (1871). Sometimes referred to as the Ku Klux Klan Act or the Second Enforcement Act of 1871, "[i]t was one of the means whereby Congress exercised the power vested in it by [§] 5 of the Fourteenth Amendment

to enforce the provisions of that Amendment." *Monroe v. Pape*, 365 U.S. 167, 170 (1961). Unlike the Civil Rights Act of 1866, which relied on criminal-enforcement mechanisms to protect the rights secured by the Fourteenth Amendment, the Civil Rights Act of 1871 took the additional step of providing a private cause of action.

In 1874, Congress sought to revise and consolidate federal law, which had become a disjointed mess of uncoordinated and often overlapping provisions. The revision of 1874 produced the Revised Statutes of the United States, which represented the first official codification of the Acts of Congress. The revisers made several small adjustments to the language of the Civil Rights Act of 1871, including expanding the scope of the private cause of action created by § 1 to include deprivations of rights "secured by the Constitution *and* laws." Cass R. Sunstein, *Section 1983 and the Private Enforcement of Federal Law*, 49 U. Chi. L. Rev. 394, 402 (1982) (emphasis added). The resulting statute, codified as Revised Statute 1979, "was thus substantially identical to current [S]ection 1983."[3] *Ibid.*

Despite its promising scope, the statute languished in relative obscurity until 1961, when the Supreme Court decided *Monroe v. Pape*. In *Monroe*, the Court examined the long history of the act, concluding that "[i]t is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts . . . [to enforce] the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment [that] might be denied by state agencies." 365 U.S. at 180. *Monroe* opened the gates for § 1983 litigants, transforming the little-used statute into a powerful tool for checking abuses by state officials. In the years after *Monroe*, the Supreme Court permitted litigants to bring § 1983 claims over a variety of alleged violations of the constitution and federal law. *See Wilson v. Garcia*, 471 U.S. 261, 273 (1985) (noting that by 1985, a "catalog of other constitutional claims" had been brought under § 1983, including "discrimination in public employment on the basis of race or the exercise of First Amendment rights, discharge or demotion without procedural due process, mistreatment of schoolchildren, deliberate indifference to the medical needs of prison inmates, [and] the seizure of chattels without advance notice or sufficient opportunity to be heard—to identify only a few").

---

[3]Revised Statute 1979 was later re-codified as 42 U.S.C. § 1983.

Despite the expansion of the § 1983 remedy post-*Monroe*, the Supreme Court has never definitively held that an alleged Contracts Clause violation is cognizable as a § 1983 claim. On the contrary, the only on-point Supreme Court decision suggests that the Contracts Clause does *not* protect an individual constitutional right enforceable under § 1983, but is rather a structural limitation placed upon the power of the States. In *Carter v. Greenhow*, the Supreme Court dealt with an alleged Contracts Clause violation brought under § 1983's predecessor statute, Revised Statute 1979. 114 U.S. 317 (1885). The central question in that case was whether a violation of the Contracts Clause subjected the plaintiff "to the deprivation of a right, privilege, or immunity secured by the [C]onstitution" such that it gave rise to a private right of action under Revised Statute 1979. *Id.* at 321. The Court noted that the Contracts Clause, "so far as it can be said to confer upon or secure to any person any individual rights, does so *only indirectly and incidentally.*" *Id.* at 322 (emphasis added). The remedy is not a private cause of action against the state official responsible for the contractual impairment, but rather "a right to have a judicial determination declaring the nullity of the attempt to impair its obligation" in a suit "to vindicate his rights under a contract." *Ibid.* Thus, an alleged Contracts Clause violation "does not show a cause of action" within the terms of Revised Statute 1979.

If we apply *Carter*'s logic to the "substantially identical" language contained in § 1983, it would seem to bar a potential plaintiff from raising a cognizable § 1983 claim based upon a Contracts Clause violation. It is unclear, however, if *Carter* retains much precedential force. In *Dennis v. Higgins*, 498 U.S. 439 (1991), for example, the Supreme Court held that § 1983 *could* provide a cause of action for an alleged Commerce Clause violation. In a footnote in that opinion, Justice White distinguished the Court's holding in *Carter*, noting that it had only "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of . . . [the Contracts Clause], to which he had 'chosen not to resort.'" *Id.* at 451 n.9 (citation omitted).

The uncertainty on this point has led to the development of an unresolved circuit split. Pointing to the language in *Dennis*, the Ninth Circuit held that a violation of the Contracts Clause can give rise to a cause of action under § 1983. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) (per curiam). In a more recent opinion, the Fourth Circuit rejected

that approach and held that alleged Contracts Clause violations still could not give rise to a viable § 1983 claim. *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011). The Fourth Circuit opinion explicitly addressed Justice White's footnote in *Dennis*, arguing that it "was intended to address the usefulness of that case in providing a framework for the analysis of § 1983 claims invoking parts of the Constitution *other* than the Contracts Clause, or alleging the deprivation of rights secured by *other* federal laws." *Id.* at 640–41 (emphasis added). Insofar as *Carter* stood "for the proposition that an attempted § 1983 action alleging state impairment of a private contract will not lie," the Fourth Circuit still found it to be good law.

This is an issue of first impression for the Sixth Circuit.[4] We join the Fourth Circuit and hold that an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983. Not only does this view better reconcile the Supreme Court's holdings in *Carter* and *Dennis* with the text and history of § 1983, but it also better comports with the time-honored principle that "it is [the Supreme Court's] prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3 (1997). As *Carter* has never been overruled, it should serve to bar the plaintiffs' cause of action in this case. Because we hold that an alleged Contracts Clause violation cannot give rise to a § 1983 claim, we need not address the defendants' claimed immunity defenses on this point.

IV

The plaintiffs-appellees next bring a procedural-due-process claim, alleging that they were denied their right to a pre- or post-deprivation hearing. Unlike a Contracts Clause claim, a due-process claim is cognizable under § 1983. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113 (1990).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). In a

---

[4]A Sixth Circuit panel has, in at least one instance, implicitly permitted a § 1983 suit to proceed on the basis of an alleged Contracts Clause violation. *See Welch v. Brown*, 551 F. App'x 804 (6th Cir. 2014). However, that case is a nonbinding unpublished opinion and was chiefly concerned with whether the district court properly issued a preliminary injunction.

procedural-due-process claim, "the deprivation of property by state action is not itself unconstitutional; 'what is unconstitutional is the deprivation of such an interest *without due process of law*.'" *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995) (quoting *Zinermon*, 494 U.S. at 125). In order to determine whether a due-process violation has occurred, we must first ask whether the plaintiffs-appellees were deprived of a constitutionally protected property right; if they were, we must then ask if the process provided was constitutionally adequate. *Ibid.*

In procedural-due-process cases, however, there is also a preliminary inquiry: Does the state action involve the kind of individualized determination that triggers due-process protections in the first place? The Supreme Court has made clear that "[t]he Constitution does not require all public acts to be done in town meeting or an assembly of the whole . . . . [Individuals'] rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). Only where "[a] relatively small number of persons [are] concerned, who [are] exceptionally affected, in each case upon individual grounds" has the Supreme Court held that a right to a hearing is due. *Id.* at 446. Here, the contested orders terminated and replaced retiree health-care benefits for *all* retirees of Lincoln Park. These were not individualized determinations about specific retirees, but rather broad determinations about Lincoln Park retirees as a whole. As such, their procedural-due-process rights were not violated. Because no due-process violation occurred, Treasurer Clinton does not even need to rely upon qualified immunity to defeat the plaintiffs-appellees' claim; it fails on the merits.

Even if we were to hold that the state action was sufficiently individualized to trigger further due-process inquiry, the plaintiffs-appellees' claim still fails. Our case law makes clear that a claim for a due-process violation does not lie where the thrust of the plaintiffs' argument is simply breach of contract. "This court has held that 'a state breach of contract action may . . . provide an adequate remedy for some deprivations of a contractually created property interest.'" *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 831 (6th Cir. 2009) (quoting *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988)). Because a due-process claim is predicated on the deprivation of a constitutionally protected interest *without due process of law*,

the availability of a state breach-of-contract remedy defeats the due-process claim.   As the *Ramsey* court explained, "it is neither workable nor within the intent of [§] 1983 to convert every breach of contract claim against a state into a federal claim."   *Ramsey*, 844 F.2d at 1273 (citations omitted).   Consequently, "[a] state breach of contract action is most clearly an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties."   *Ibid.*

Here, the plaintiffs-appellees' claimed property right derives from contract—specifically, the disputed collective-bargaining agreements.   Coulter's orders terminating and replacing "the sections of all Collective Bargaining Agreements with the City . . . regarding retiree health care and Medicare Part B reimbursement" are in direct violation of those agreements.   The plaintiffs-appellees do not attempt to explain why a state breach-of-contract claim against the City of Lincoln Park is insufficient to safeguard their contractual property rights.   As "the only difference between this case and any other garden-variety breach of contract case is that the City happened to be one of the contracting parties," the plaintiffs-appellees have not made out a viable due-process claim.   *Taylor Acquisitions, L.L.C.*, 313 F. App'x at 832.   Because their claim fails on the merits, there is no need to reach the issue of immunity.

V

Finally, the plaintiffs-appellees raise a Takings Clause claim.   The Takings Clause and the Due Process Clause both "stand directly in opposition to state action intended to deprive people of their legally protected property interests."   *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Connor, J., concurring).   Just as with the Due Process Clause, "a mere allegation of property deprivation does not by itself state a constitutional claim."   *Ibid.*   Rather, "in challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate."   *Ibid.* (citation omitted).

Here, the plaintiffs-appellees' claimed property right can be vindicated through a suit in contract upon the disputed collective-bargaining agreements.   Because the state contract action "is available as a remedy for any uncompensated taking" suffered by the plaintiffs-appellees,

their "challenges to the constitutionality of [Coulter's orders] are not ripe for our resolution." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984). Therefore, the plaintiffs-appellees' Takings Clause claim fails for the same reason as their due-process claim: the availability of a remedy in state contract law. As their claim fails on the merits, there is no need to evaluate the appellants' alleged immunity defenses.

## VI

The plaintiffs-appellees present an undoubtedly sympathetic plight. They lost health-care benefits that they believed to be secure because of the long-term financial mismanagement of Lincoln Park, a factor which was largely out of their control. In seeking a legal remedy, however, they bring the wrong kind of suit against the wrong parties. The proper recourse for the plaintiffs-appellees is a suit against the City of Lincoln Park alleging a violation of the collective-bargaining agreements, not a suit against current and former state treasurers alleging violations of protected constitutional rights. Therefore, we REVERSE the decision of the district court and DISMISS the plaintiffs' case against the defendants-appellants.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  The majority today holds that a violation of the Contracts Clause of the United States Constitution cannot give rise to a cause of action under 42 U.S.C. § 1983.[1]  Because I find the majority's conclusion in conflict with the precedent of both the Supreme Court and our Circuit, and because the majority's new rule runs afoul of the Supreme Court's directive that § 1983 be broadly construed, I respectfully dissent.

**I.**

Section 1983 of Title 42 of the United States Code "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem,* 378 F.3d 566, 576 (6th Cir. 2004).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).  The Supreme Court, relying on congressional intent, has instructed lower courts that § 1983 is to be "liberally construed."  *See Schultz v. Wellman,* 717 F.2d 301, 305 n.10 (6th Cir. 1983) (quoting *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400 (1979)).

The majority begins its incursion on § 1983 by stating that "the Supreme Court has never definitively held that an alleged Contracts Clause violation is cognizable as a § 1983 claim.  On the contrary, the only on-point Supreme Court decision suggests that the Contracts Clause does *not* protect an individual constitutional right enforceable under § 1983."  Maj. Op. at 9.  In *Carter v. Greenhow,* 114 U.S. 317 (1885), the Supreme Court addressed whether a Virginia plaintiff could pay his property taxes using coupons cut from bonds that were issued by the Commonwealth of Virginia.  The plaintiff in *Carter* had received a certain number of coupons

---

[1]Though this case was fully briefed and we heard oral argument, the majority concedes that this issue was "not briefed by either of the parties."  Maj. Op. at 7.  I am deeply troubled by the majority's decision to issue such a sweeping and consequential ruling when neither party has been heard on the issue.

from the Commonwealth that he believed he could use to pay the taxes on his property. After the Commonwealth changed its laws regarding accepting coupons for property-tax payments, Carter's coupons were rejected by the treasurer in Richmond, Virginia. Carter's lawsuit was brought under the precursor statute to § 1983, which provided relief for persons "subjected by the defendant, under color of a statute of a State, to the deprivation of a right, privilege or immunity secured by the Constitution." *Id.* at 321. The Supreme Court concluded that Carter's lawsuit may have implicated the Contracts Clause but that he failed to plead that it did, and in any event, his right to pay his taxes with coupons rather than money was not a right "directly secured to him by the Constitution." *Id.* at 322. Importantly, Carter never pleaded expressly a violation of the Contracts Clause, and the Court held only that "the declaration now before us does not show a cause of action within its terms." *Id.* at 323.

I disagree with the Majority's assertion that "[i]f we apply *Carter*'s logic to the 'substantially identical' language contained in § 1983, it would seem to bar a potential plaintiff from raising a cognizable § 1983 claim based upon a Contracts Clause violation." Maj. Op. at 9. The *Carter* Court did not opine on whether a Contracts Clause violation could give rise to a suit under the § 1983 precursor statute; it concluded, citing "the declaration now before us," that a complaint that failed even to allege a violation of the Contracts Clause could not give rise to such a cause of action. *Carter*, 114 U.S. at 323. Further, the Court instructed that "[i]t might be difficult to enumerate the several descriptions of rights secured to individuals by the Constitution, the deprivation of which, by any person, would subject the latter to an action for redress" under the precursor statute to § 1983. *Id.* It simply does not follow from a faithful reading of *Carter* that the Court intended so severely to restrict, as the majority does today, the force of what would eventually become § 1983.

The majority concedes that *Carter* may not retain "much precedential force." Maj. Op. at 9. In *Dennis v. Higgins*, 498 U.S. 439, 440 (1991), the Supreme Court held that an alleged violation of the Commerce Clause could give rise to a cause of action under § 1983. The dissent in *Dennis* argued, as the majority today holds, that after *Carter*, "the Commerce Clause does not secure any rights, privileges, or immunities within the meaning of § 1983." *Id.* at 451 n.9. The *Dennis* majority rejected the dissent's reliance on *Carter* because *Carter* "held as a matter of

pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the 'right secured to him by that clause of the Constitution [the contract clause], to which he had 'chosen not to resort.'" *Id.* (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 613 n.29 (1979)). The Court majority in *Dennis* admonished that "This Court . . . has already given [*Carter*] a narrow reading." *Id.* I therefore cannot accept the majority's invitation to give *Carter* its broadest possible interpretation, and to ignore the Supreme Court's directive to construe § 1983 liberally.

## II.

The majority is correct that two of our sister circuits have addressed whether an alleged violation of the Contracts Clause can give rise to a cause of action under § 1983. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (concluding that a violation of the Contracts Clause can give rise to a cause of action under § 1983); *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) (concluding that an action alleging state impairment of a private contract cannot give rise to a § 1983 cause of action). The Ninth Circuit relied heavily on the *Dennis* Court's statement that § 1983 shall be "liberally and beneficently construed," and on the Supreme Court's noting that *Carter* was dismissed because of a pleading deficiency and must therefore be read narrowly. *S. Cal. Gas Co.*, 336 F.3d at 887. The Fourth Circuit addressed *Dennis*, but concluded that the "narrow reading" language meant only that *Carter* dealt with the Contracts Clause and could not be applied to rights secured by other federal laws. *Crosby*, 635 F.3d at 641. The Fourth Circuit did not support its strained reading of *Dennis* with a single citation, and the majority's opinion today provides no precedential support for that interpretation. Moreover, a panel of this Circuit has implicitly held that a Contracts Clause violation can give rise to a cause of action under § 1983. *See Welch v. Brown*, 551 F. App'x 804, 812 (6th Cir. 2014) (affirming a district court's grant of a preliminary injunction because a Contracts Clause claim brought under § 1983 had a likelihood of success on the merits).

I would therefore follow the Supreme Court's direction to read *Carter* narrowly and to construe § 1983 liberally, and I conclude that an alleged violation of the Contracts Clause can give rise to a violation of § 1983. Accordingly, I would **AFFIRM** the judgment of the district court on the Contracts Clause claim.

## III.

I would reverse the district court's judgment on the Due Process Clause and Takings Clause claims only because I conclude that the complaint fails to allege with specificity facts that can state a claim for relief against these Defendants under either clause.