RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LABORERS' INTERNATIONAL UNION OF NORTH
AMERICA, LOCAL 860, on behalf of itself and its
members,

        *Plaintiff-Appellant*,

    *v.*

TEREASE Z. NEFF; HON. THOMAS F. O'MALLEY;
CUYAHOGA COUNTY, OHIO COMMON PLEAS COURT,
JUVENILE DIVISION,

        *Defendants-Appellees*.

No. 21-3653

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-02714—Pamela A. Barker, District Judge.

Argued: March 10, 2022

Decided and Filed: March 23, 2022

Before: SUTTON, Chief Judge; GIBBONS and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Austin T. Opalich, MANGANO LAW OFFICES CO., L.P.A., Cleveland, Ohio, for
Appellant. Max V. Rieker, WALTER | HAVERFIELD LLP, Cleveland, Ohio, for Appellees.
**ON BRIEF:** Austin T. Opalich, Joseph J. Guarino III, Ryan K. Hymore, MANGANO LAW
OFFICES CO., L.P.A., Cleveland, Ohio, for Appellant. Max V. Rieker, R. Todd Hunt,
Alejandro V. Cortes, WALTER | HAVERFIELD LLP, Cleveland, Ohio, for Appellees.

    SUTTON, C.J., delivered the opinion of the court in which GIBBONS and GRIFFIN, JJ.,
joined. SUTTON, C.J. (pp. 13–15), also delivered a separate concurring opinion.

_____

**OPINION**

_____

SUTTON, Chief Judge.    When contract negotiations broke down between an Ohio juvenile court and the union that represents the court's employees, the union took the court to federal court.  Because the juvenile court is an arm of the State, the district court correctly held that sovereign immunity bars most of the union's claims.  And because the union's remaining contentions fail to state a claim for relief, we affirm across the board.

I.

Ohio's third branch of government is divided into three courts:  the Ohio Supreme Court, the intermediate courts of appeals, and the courts of common pleas.  Ohio Const. art. IV, § 1. There are twelve courts of appeals, each broken down into geographical districts, with some districts covering just one heavily populated county (e.g., the Eighth District Court of Appeals, which covers Cuyahoga County) but most of them covering several counties.  Ohio Rev. Code § 2501.01.  There are 88 courts of common pleas, the State's courts of general jurisdiction, one for each county in the State.  *See id.* § 2301.01.  Most courts of common pleas contain subject matter divisions for juvenile, probate, or domestic relations matters only.  *See id.* § 2301.03.  In addition to the courts that the Ohio Constitution creates, the Ohio legislature has established municipal and county courts, which possess jurisdiction within their territorial limits over certain criminal matters and over civil matters where the amount in controversy does not exceed $15,000.  *Id.* §§ 1901.02, 1907.01, 1901.17, 1907.03, 1901.20, 1907.02.

Cuyahoga County has a Juvenile Court with six judges.  *Id.* § 2153.02.  Other than the limitation on subject matter, the judges have the same authority as other common pleas judges. *Id.*; *In re Z.R.*, 44 N.E.3d 239, 242 (Ohio 2015).

In 2012, the employees of the Juvenile Court certified labor union Local 860 as their exclusive collective bargaining representative.  The union represents 136 employees who work in a range of positions, including as legal services clerks, as probation officers, and as custodial and food service workers in juvenile detention facilities.  It does not represent judges.

In 2016, the union and the Juvenile Court renewed their collective bargaining agreements. The new contracts dealt with wages, holidays, sick leave, health insurance, and other conventional topics. The parties agreed that the new contracts would extend from January 1, 2017, through December 31, 2019. Each contract added that the Court would respect its terms until the parties reached a new agreement, the union disclaimed interest in the contract, or the employees decertified the union.

In 2019, the relationship soured. Attempts to negotiate a new agreement stalled. Consensus continued to elude them in 2020. On December 1, 2020, the union alleges, the Juvenile Court "unilaterally proclaimed" the contracts invalid. R.1 at 7. That day, the Juvenile Court filed a lawsuit in state court asking it to declare the agreements void or expired. The union counterclaimed for breach of contract. In the days that followed, the union alleges, relations continued to spiral, as the Juvenile Court treated the union's members as nonunion employees, announced a plan to stop deducting union dues from paychecks, imposed new work schedules, and eliminated grievance procedures.

The union sued the Juvenile Court in federal court. In addition to naming the court, it filed the lawsuit against Judge Thomas O'Malley, the court's administrative judge, and Terease Neff, the court administrator, in their personal and official capacities. As relevant here, the union claimed the Juvenile Court and the administrators violated the Contracts Clause and the Takings Clause of the U.S. Constitution by breaching the collective bargaining agreements.

The Juvenile Court moved to dismiss, and the district court granted the motion. It reasoned that sovereign immunity bars the union's claims against the Juvenile Court because it is an arm of the State of Ohio. It reasoned that § 1983 does not provide a cause of action for the union's Contracts Clause claims against O'Malley and Neff. It reasoned that the union's request for an injunction under the Takings Clause failed because the union failed to plead an inadequate remedy at law. And it reasoned that qualified immunity barred the money-damages claims against the administrators under the Takings Clause.

II.

"When the States entered the federal system, they did so with their sovereignty intact." *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2258 (2021) (quotation omitted). One feature of sovereignty is immunity from suit. *Id.* Whether reflected in the words of the Tenth or Eleventh Amendments or background principles to the Convention, sovereign immunity protects States and the Federal Government from litigation except in "limited circumstances." *Id.* That remains true for the States whether the case is filed in state or federal court, whether the plaintiff is a citizen of the defendant State or not, and whether the lawsuit's target is the State or an official acting on its behalf. *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc).

Broadly though these principles sweep, exceptions exist. Waiver by a State is one. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). Authorized abrogation by Congress is another. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). A lawsuit by the federal government is a third. *West Virginia v. United States*, 479 U.S. 305, 311 (1987). On top of these and other exceptions, immunity applies only to lawsuits against the State or "an arm of the State," not to those against political subdivisions like counties. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

Familiar considerations shape the application of the arm-of-the-State inquiry to the Juvenile Court. Among them are: (1) the State of Ohio's "potential liability" for a judgment against the Juvenile Court; (2) the way in which state law describes the Juvenile Court and "the degree of state control and veto power over the [Court's] actions"; (3) the extent to which state officials control membership on the Juvenile Court; and (4) the extent to which the Juvenile Court's "functions fall within the traditional purview of state or local government." *Ernst*, 427 F.3d at 359. While the first factor—the potential impact on the state treasury of any judgment—is undoubtedly important, it does not control the inquiry. *Id.* at 364; *see also Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 761–62 (6th Cir. 2010). Sovereign immunity after all guards against money-damages and injunction actions. *Ernst*, 427 F.3d at 364–65. It not only protects a State's treasury, but it also "pervasively . . . emphasizes the integrity retained by each State in our federal system," a consideration that applies to money-damages and injunction actions. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994).

Consider each factor in turn.  *First*, everyone agrees that Cuyahoga County would pay any judgment against the Juvenile Court.  That consideration favors treating the Juvenile Court as a component of the County.

*Second*, the State treats the common pleas courts and their subdivisions as segments of state government.  The Ohio Constitution creates a "unified state judicial system," *Pucci*, 628 F.3d at 762, providing that the "judicial power of the state is vested in a supreme court, courts of appeals, [and] courts of common pleas and divisions thereof," Ohio Const. art. IV, § 1; *see Mumford v. Basinski*, 105 F.3d 264, 268 (6th Cir. 1997).  The legislature filled in the details, enacting "comprehensive state legislation" governing the State's courts.  *Ernst*, 427 F.3d at 360; *Pucci*, 628 F.3d at 762; *see* Ohio Rev. Code §§ 2151.07, 2153.01, 2153.16.  State officials are responsible for creating new courts and adding judgeships, Ohio Const. art. IV, § 15, and the legislature has the "exclusive constitutional authority to define" the common pleas courts' jurisdiction, *State v. Aalim*, 83 N.E.3d 883, 887 (Ohio 2017).  The courts may constitutionally exercise "statewide subject-matter jurisdiction." *Cheap Escape Co. v. Haddox, LLC*, 900 N.E.2d 601, 604 (Ohio 2008).  And a judge of a subdivision of the court of common pleas, including a juvenile court judge, is a judge of the State, complete with authority to serve temporarily throughout Ohio's lower court system if circumstances require.  Ohio Const. art. IV, § 5(A)(3).

The State also exercises considerable control over the courts.  The "fundamental law of Ohio imparts supervisory authority over all courts of that state, and the authority to promulgate rules for all courts of that state, to the Ohio Supreme Court." *Mumford*, 105 F.3d at 268.  The State Constitution also "dictates standards controlling the election, residency, tenure, compensation, and eligibility of every Ohio common pleas judge." *Id.*  State statutes play a role too.  *See* Ohio Rev. Code § 2153.02.  Although the counties fund the courts' day-to-day operations, they do so at the behest of the legislature. *Mumford*, 105 F.3d at 269.  The board of commissioners in Cuyahoga County, for example, "shall provide suitable accommodations, facilities, and equipment for the [Juvenile Court], its officers, and employees."  Ohio Rev. Code § 2153.07; *see also id.* § 307.01(B).  The State itself pays the bulk of judges' salaries. *Id.* §§ 141.04, 141.05.  Whether as a matter of Ohio's Constitution, its statutes, or its fisc, the State

exercises considerable control over juvenile courts, just as it does over its courts of general jurisdiction, courts of common pleas.

*Third*, the State exercises substantial influence over Juvenile Court membership. This factor favored "granting sovereign immunity" to the state trial courts of Michigan given that state officials controlled the removal of judges and the governor filled any vacancies. *Pucci*, 628 F.3d at 763. That was true even though Michigan voters elected the judges and the City in which each trial court was located oversaw its staff's employment. *Id.* The Ohio courts of common pleas and juvenile courts warrant the same treatment. The Ohio governor fills any vacancy. Ohio Const. art. IV, § 13; Ohio Rev. Code § 2153.05. And the legislature may remove judges by a two-thirds vote. Ohio Const. art. IV, § 17. As in *Pucci*, this factor supports finding immunity.

*Fourth*, state courts quintessentially fall within the "traditional purview of state government." *Pucci*, 628 F.3d at 764. The state judiciary is "one of three essential branches of state government." *Ernst*, 427 F.3d at 361. The Federal Constitution "recognizes and preserves the autonomy and independence of the states . . . in their judicial departments." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938) (quotation omitted); *see S.J. v. Hamilton County*, 374 F.3d 416, 421 (6th Cir. 2004); *Pucci*, 628 F.3d at 764. The state courts serve as the State's "adjudicative voice." *S.J.*, 374 F.3d at 421 (quotation omitted); *Pucci*, 628 F.3d at 764. Their functions not only overlap with the "traditional purview of state government," but they also fall "exclusively" within it. *Pucci*, 628 F.3d at 764. If any entity qualifies as an arm of the State, a state court does.

Valuable as multi-factor tests may be in the abstract, they rarely beat case decisions in the concrete. In case after case, we have held and said that the courts in a State's third branch of government count as arms of the State. *See Pucci*, 628 F.3d at 764; *Ernst*, 427 F.3d at 365; *S.J.*, 374 F.3d at 421–24; *Mumford*, 105 F.3d at 260–70; *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, 276 F.3d 808, 810 (6th Cir. 2002) (en banc); *Wellman v. Sup. Ct. of Ohio*, No. 18-3260, 2018 WL 9651499, at *2 (6th Cir. Nov. 13, 2018); *Smiles v. Royster*, No. 18-1440, 2018 WL 4998196, at *2 (6th Cir. Oct. 1, 2018); *Vaughn v. Common Pleas Ct. of Montgomery Cnty.*, No. 16-4282, 2017 WL 5514436, at *1 (6th Cir. May 4, 2017); *Ward v. City of Norwalk*, 640 F. App'x 462, 465 (6th Cir. 2016); *Smith v. Leis*, 407 F. App'x 918, 932 (6th Cir. 2011); *Dolan v.*

*City of Ann Arbor*, 407 F. App'x 45, 46–47 (6th Cir. 2011); *Triplett v. Connor*, 109 F. App'x 94, 96 & n.4 (6th Cir. 2004); *Meyers v. Franklin Cnty. Ct. of Common Pleas*, 81 F. App'x 49, 55 (6th Cir. 2003); *Williams v. Leslie*, 28 F. App'x 387, 389 (6th Cir. 2002) (per curiam); *Howard v. Virginia*, 8 F. App'x 318, 319 (6th Cir. 2001); *Oswald v. Lucas Cnty. Juv. Det. Ctr.*, 234 F.3d 1269, 2000 WL 1679507, at *2 (6th Cir. 2000) (per curiam) (unpublished table opinion); *Lazirko v. Parma Mun. Ct.*, 181 F.3d 101, 1999 WL 282635, at *1 (6th Cir. 1999) (unpublished table opinion).  The same conclusion applies here.

Other circuits, indeed all circuits addressing the question to our knowledge, have come to similar conclusions.  *See, e.g.*, *Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002); *Gollomp v. Spitzer*, 568 F.3d 355, 367–68 (2d Cir. 2009); *Benn v. First Jud. Dist. of Pa.*, 426 F.3d 233, 240–41 (3d Cir. 2005); *Wash. Legal Found. v. Tex. Equal Access to Just. Found.*, 94 F.3d 996, 1005 (5th Cir. 1996); *Kelly v. Mun. Cts. of Marion Cnty.*, 97 F.3d 902, 907–08 (7th Cir. 1996); *Clark v. Clark*, 984 F.2d 272, 273 (8th Cir. 1993); *Simmons v. Sacramento Cnty. Superior Ct.*, 318 F.3d 1156, 1161 (9th Cir. 2003); *Collins v. Daniels*, 916 F.3d 1302, 1316 (10th Cir. 2019); *Simmons v. Conger*, 86 F.3d 1080, 1085 (11th Cir. 1996); *see also* 13 Charles Alan Wright et al., Federal Practice & Procedure § 3524.2 (3d ed. 2008) ("As a general matter, state courts are considered arms of the state.").

The union resists this conclusion and this authority, claiming that the Juvenile Court is a county entity, not a state entity.  It emphasizes that Cuyahoga County, not the State of Ohio, would pay any judgment in this case, invoking our observation that "the state-treasury inquiry will generally be the most important" factor in the inquiry.  *Ernst*, 427 F.3d at 364.  But this case shows why the who-pays-the-judgment inquiry is "not the sole criterion," a point we clarified in our en banc decision in *Ernst*.  *Id.* (quotation omitted).  That the state court system is one of the three branches of state government offers a compelling reason for treating it as the State in federal-court litigation.  That explains why we treat the Michigan trial courts as the State and why the source of payment of any judgment does not change things.  *Pucci*, 628 F.3d at 764. "[I]n the context of a court system that . . . is mandated by the state constitution to be uniform and to be supervised by one supreme court," we explained, it would be a "particular affront" to the State to subject the court to suit.  *Id.* (quotation omitted).  We strongly suggested the same

was true for another Ohio court, the Hamilton County Juvenile Court, in a case where we noted that "one would expect" respect for Ohio's third branch of government would "weigh heavily" in favor of finding that a state court is an arm of Ohio. *S.J.*, 374 F.3d at 421.

This question and answer defeat the union's reliance on *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003). In that case, we questioned whether *Mumford* was correctly decided because it omitted any discussion of who would pay a judgment against the Lorain County Domestic Relations Court—perhaps because the point was not argued. *Id.* at 812–13. But as just shown, *Mumford*'s holding—that the Lorain County Domestic Relations Court is an arm of the State—remains good law. *Ernst* and *Pucci* at a minimum confirm as much.

The union separately pushes back on the idea that the State exercises control over the Juvenile Court, pointing out that the County has some control as well. The County, it notes, pays for court accommodations, facilities, and equipment and exercises some discretion in appropriating funds and setting employee compensation. But this funding occurs only because a state statute says that the County "shall" provide "suitable" resources. Ohio Rev. Code § 2153.07. The Ohio Constitution's separation-of-powers principles also preclude the County from limiting funding if it interferes with the "free and untrammeled exercise" of the court's functions. *Zangerle v. Ct. of Common Pleas of Cuyahoga Cnty.*, 46 N.E.2d 865, 871–72 (Ohio 1943) (quotation omitted). That the State has delegated some funding responsibility to a local government does not cancel out the State's extensive authority over the Juvenile Court. The courts of common pleas remain creatures of the Ohio Constitution and state statute and remain the third branch of *state* government. All in all, the Ohio state courts in general and the Juvenile Court in particular remain state entities for sovereign immunity purposes. *See Pucci*, 628 F.3d at 764.

The union falls back on a distinct argument—that, even if the Juvenile Court counts as the State for some purposes, it does not count as the State for employment purposes. Court staff, it points out, are county employees, suggesting that sovereign immunity should not apply when the Juvenile Court makes employment decisions with respect to those individuals. But this dividing and conquering does not work. For one, court staff still answer to the administrative juvenile judge. The "authority to hire personnel" for the Juvenile Court "is delegated by state

statute" to the court itself rather than to county administrators. *Mumford*, 105 F.3d at 269. The administrative juvenile judge is responsible for hiring. *See* Ohio Rev. Code §§ 2151.13, 2153.08. He or she fixes compensation in the first instance and has the ultimate responsibility for firing employees. *Id.* §§ 2151.13, 2153.08, 2153.09; *see also Abbott v. Stepanik*, 582 N.E.2d 1082, 1083–84 (Ohio Ct. App. 1990).

For another, the administrative juvenile judge does not answer to the county board of commissioners. Voters select juvenile judges. Ohio Rev. Code § 2153.03. And those judges select one of their number to fill the administrative judge role. *Id.*; *see* Ohio Sup. R. 3(B). Juvenile judges may serve across the State. Ohio Const. art. IV, § 5(A)(3). Ohio pays most of their compensation. Ohio Rev. Code §§ 141.04, 141.05. And they take an oath to support the Ohio Constitution. *Id.* § 3.23. When acting as an employer, then, the Juvenile Court principally acts through a state official, offering one more reason among many for continuing to treat it as a state entity. All of this explains why we have rejected a similar argument before. *See Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 331 (6th Cir. 2010) (rejecting county agency's argument that we should only consider those agency functions related to the plaintiff's claims).

For still another reason, this kind of functional argument does not work with a state court. A federal court's interference with a state court's employees, at the instance of a private entity, is no less an affront to the integrity of the court than a claim against the court itself. *See Pucci*, 628 F.3d at 764. It might be a different case if the governmental entity shared qualities of a protected court entity and an unprotected county entity. *See S.J.*, 374 F.3d at 420–22 (permitting claims against a juvenile detention facility). In that setting, it might make sense to consider the function being exercised. But here it does not. This coequal branch of state government *is* the State, no less than the legislature or the governor—pulling all of its employees within its authority for immunity purposes.

## III.

Our conclusion that the Juvenile Court is an arm of the State resolves many of the union's claims. The union cannot sue the court itself or recover damages from the administrators in their

official capacities. *McCormick v. Miami Univ.*, 693 F.3d 654, 661–62 (6th Cir. 2012). But that still leaves the possibility that the union may bring injunctive-relief claims under the Contracts Clause and Takings Clause against the administrators in their official capacity, *Ernst*, 427 F.3d at 358, and bring money-damages claims under the same Clauses in the administrators' individual capacity, *Pucci*, 628 F.3d at 765.

*Contracts Clause.* States may not "pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The U.S. Supreme Court has held that this prohibition bars States from "imposing a substantial impairment on a contractual relationship . . . unless that impairment amounts to a reasonable and appropriate means of achieving a significant and legitimate public purpose." *Mich. State AFL-CIO v. Schuette*, 847 F.3d 800, 804 (6th Cir. 2017) (quotations omitted). We have held, however, that "an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983." *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017). Accordingly, the union's request for relief under § 1983 cannot proceed.

The union asks us to "reconsider" *Kaminski*. Appellant's Br. at 21. But a prior published opinion binds our panel "unless an inconsistent decision of the United States Supreme Court requires modification" of our opinion, the en banc court overrules it, or it conflicts with an even earlier case. *Darrah v. City of Oak Park*, 255 F.3d 301, 309–10 (6th Cir. 2001) (quotation omitted). The union does not identify a Supreme Court case since *Kaminski*. While it points to a pre-*Kaminski* decision in which we affirmed an injunction against enforcement of a Michigan law on Contracts Clause grounds, nowhere in that opinion did we suggest we were allowing the plaintiffs to proceed under § 1983 or that the defendants had objected that the plaintiffs lacked a cause of action. *Mich. State AFL-CIO*, 847 F.3d at 803–05.

*Takings Clause—Injunction.* The Juvenile Court's status as an arm of the State would not prevent us from enjoining the administrators from future violations of the Takings Clause. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). Still, to obtain an injunction, the union must establish not only that the challenged conduct qualifies as a taking, but that it also has no "adequate remedy at law." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019). In other words, it must show that no acceptable "provision for obtaining just compensation exists." *Id.*

The union cannot do so.  Ohio allows it to pursue the rights allegedly secured under the collective bargaining agreements by filing in state court.  The Ohio Supreme Court has explained that the "proper vehicle" for resolving "whether a contractual obligation exists between" a state court and a union representing its employees is "a declaratory judgment action in the court of common pleas."  *State ex rel. Ohio Council 8, Am. Fed. of State, Cnty. & Mun. Emps. v. Spellacy*, 478 N.E.2d 229, 232 (Ohio 1985) (plurality opinion).  That tracks the union's path so far.  It has already asked a state court to declare that the Juvenile Court breached the agreements and award damages, and its complaint contains no allegations suggesting that route is inadequate.  Because the claimed rights can be "vindicated through a suit in contract upon the disputed collective-bargaining agreements," *Kaminski*, 865 F.3d at 349, the union cannot show its allegations warrant injunctive relief.

The union pushes back, arguing that this last analysis conflicts with *Knick*.  After *Knick*, it claims, it need not plead that it exhausted state-law procedures before bringing a takings claim, and the district court erred in thinking so.  But it is the union that has its wires crossed.  *Knick* authorized property owners to seek damages in federal court without first resorting to state law remedies.  139 S. Ct. at 2172–73.  But in the next breath, the Court noted that so "long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."  *Id.* at 2176.  The availability of a legal remedy does not on its own bar the damages claims.  But it does preclude an injunction.

*Takings Clause—Damages*.  That leaves the union's individual-capacity damages claims under the Takings Clause.  Qualified immunity protects the administrators from these claims "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Gean v. Hattaway*, 330 F.3d 758, 767 (6th Cir. 2003) (quotation omitted).  They can invoke that protection unless "any reasonable public official" in their shoes would have understood that their "conduct violated the right."  *Id.*

But we have not found a case, as an initial matter, in which a government official merely breached a contract and a cognizable Takings Clause claim arose from the breach.  To the contrary, our cases suggest that where a party claims that a governmental entity breached rights

guaranteed by a contract, "the proper recourse would be a breach-of-contract claim, not a takings claim." *B&B Trucking, Inc. v. U.S. Postal Serv.*, 406 F.3d 766, 769 (6th Cir. 2005) (en banc).

But even if state officials breaching a contract somehow violate the Takings Clause, no precedent clearly establishes the point. Officials of "reasonable competence could disagree" on whether a breach occurred here. *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quotation omitted). The administrators could have reasonably concluded that the agreements no longer applied. The contracts specified that they would "remain in full force and effect until December 31, 2019," R.1-1 at 37; R.1-2 at 43, nearly a year before the alleged breach on December 1, 2020.

In response, the union points to the agreements' preambles, which state that the court agrees to "abide by the terms of this Agreement until such time as a successor agreement is negotiated between the parties, the Union disclaims interest, or the employees elect to decertify the Union as their exclusive bargaining representative." R.1-1 at 5; R.1-2 at 5. But in the face of the tension between those terms and the agreements' explicit expiration dates, it was not unreasonable for the administrators to conclude that the more specific duration term controlled.

We affirm.

—————————

**CONCURRENCE**

—————————

SUTTON, Chief Judge, concurring.  Section 1983 says that, when state officials deprive individuals and entities "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States, they may sue the relevant state actor.  42 U.S.C. § 1983.  Among other questions presented by today's dispute is this one:  Does the statute create a right of action for claims premised on violations of the Contracts Clause, which bars the States from "impairing the Obligation of Contracts"?  U.S. Const. art. I, § 10, cl. 1.

There are two schools of thought.  Under one of them, the Supreme Court limited § 1983's reach to the "confines of racial problems."  Theodore Eisenberg, *Section 1983: Doctrinal Foundations and an Empirical Study*, 67 Cornell L. Rev. 482, 485 (1982); Michael G. Collins, *"Economic Rights," Implied Constitutional Actions, and the Scope of Section 1983*, 77 Geo. L.J. 1493, 1500–07 (1989).  Two relatively early examples confirm the point, each of them dealing with successful challenges to interference with African Americans' voting rights.  *See Lane v. Wilson*, 307 U.S. 268, 269, 277 (1939); *Myers v. Anderson*, 238 U.S. 368, 378, 383 (1915).  Consistent with this approach, the Court was skeptical of applying the law beyond this setting.  *See, e.g.*, *Carter v. Greenhow*, 114 U.S. 317 (1885) (seeming to reject the statute's application to a Contracts Clause claim); *Holt v. Ind. Mfg. Co.*, 176 U.S. 68 (1900) (rejecting the statute's application to constitutional challenges to a state tax provision); Comment, *The Civil Rights Act: Emergence of an Adequate Federal Civil Remedy?*, 26 Ind. L.J. 361, 363 (1951) (finding only 21 cases decided under the statute from 1871 to 1920).  This approach prevailed for the first 90 years or so of the statute's existence.

More recently, a second school of thought has taken hold.  Ever "since the 1960s, § 1983 has emerged as easily the most important statute authorizing suits against state officials for violations of the Constitution," Richard H. Fallon, Jr., et al., *Hart and Wechsler's The Federal Courts and the Federal System* 986–87 (7th ed. 2015), becoming "the general federal remedy for violations of all constitutional rights," Eisenberg, *supra*, at 486; *see* Collins, *supra*, at 1537.  Actionable rights under § 1983 changed from including only "civil" rights, *Holt*, 176 U.S. at 72,

to adding "personal" rights, *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 531–32 (1939) (opinion of Stone, J.), to abolishing unmanageable distinctions between "personal" and "property" rights, *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 542 (1972).

Under this "broad construction" of the statute, "compelled" by its sweeping reference to "any rights" in "the Constitution and laws" of the United States, the statute has been applied to all manner of constitutional rights, including structural guarantees such as the dormant Commerce Clause. *Dennis v. Higgins*, 498 U.S. 439, 440, 443 (1991). After the U.S. Supreme Court determined that § 1983 provides a cause of action for violations of federal statutes, *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), the statute has vindicated all manner of statutory rights. *See, e.g.*, *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) (Medicaid's anti-lien provision); *Wilder v. Va. Hosp. Assoc.*, 496 U.S. 498 (1990) (Medicaid's reimbursement rates); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) (National Labor Relations Act); *Thiboutot*, 448 U.S. at 4 (Social Security Act). Even as he resisted this trend, Judge Friendly noted that the statute had been transformed from dealing with "the kind of case that was at the core of congressional concern in 1871" to reaching the "full extent of [§ 1983's] language." *Eisen v. Eastman*, 421 F.2d 560, 565–66 (2d Cir. 1969).

Our court has one foot in the past and one foot in the present with respect to today's question. In *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017), we addressed whether § 1983 provides a right of action to enforce a claim under the Contracts Clause. In holding that it does not, we felt bound by *Carter v. Greenhow*, 114 U.S. 317 (1885), which seemed to reject a similar claim. *Kaminski*, 865 F.3d at 347. At the same time, we acknowledged the force of the intervening precedent. *Id*. at 346. One member of the panel took a different view. *See id.* at 350–51 (Moore, J., dissenting) (determining that *Carter* did not resolve the question and concluding that the statute covered a Contracts Clause claim). That division mirrors a division in the courts of appeals. *Compare S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam) (allowing a § 1983 action to vindicate a claim under the Contracts Clause), *with Crosby v. City of Gastonia*, 635 F.3d 634, 639–43 (4th Cir. 2011) (rejecting the right of action). While this case may not present an ideal vehicle for resolving the divide between these

two schools of thought—because the impairment does not appear to arise from a legislative act—it would seem appropriate at some point for the U.S. Supreme Court to address the issue.